IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| OREGON NATURAL DESERT ASSOCIATION; ET AL., | ) ) ) | Civil No. 03-213-JO |
| Plaintiffs, | ) ) | |
| v. | ) ) | <u>OPINION AND ORDER</u> |
| UNITED STATES FOREST SERVICE; ET AL., | ) ) | |
| Defendants. | ) ) | |

Peter M. Lacy
OREGON NATURAL DESERT ASSOCIATION
917 S.W. Oak Street, Suite 408
Portland, OR 97205

Stephanie M. Parent
PACIFIC ENVIRONMENTAL ADVOCACY CENTER
10015 S.W. Terwilliger Boulevard
Portland, OR 97219

  Attorneys for Plaintiffs

Stephen J. Odell
UNITED STATES ATTORNEY'S OFFICE
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-1024

Val J. Black
U.S. DEPARTMENT OF AGRICULTURE
Office of General Counsel
1220 S.W. Third Avenue, Suite 1734
Portland, OR 97204

Attorneys for Defendants

Paul A. Turcke
MOORE SMITH BUXTON & TURCKE, CHARTERED
225 North 9th Street, Suite 420
Boise, ID 83702

Elizabeth E. Howard
CHURCHILL LEONARD LODINE & HENDRIE, LLP
605 Center Street, N.E.
Salem, OR 97308-0804

Hertha L. Lund
Karen J. Budd-Falen
Marc R. Stimpert
Michael P. Van Tassell
Richard M. AuBuchon
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Cheyenne, WY 82003-0346

Attorneys for Intervenor-Defendants

JONES, Judge:

The Oregon Natural Desert Association and the Center for Biological Diversity

(collectively "ONDA") bring this action to abate livestock grazing in Eastern Oregon on federal

range lands that are under the supervision of the United States Forest Service ("Forest Service").

Both the Forest Service and ONDA move for summary judgment, as do two intervenor-

defendants: Robertson Ranch, a grazing permittee affected by ONDA's action, and the Oregon

Cattlemen's Association ("OCA") on behalf of other affected grazing permittees. The OCA also moves to dismiss on jurisdictional grounds.

For the reasons stated below, the Forest Service's cross-motion for summary judgment is GRANTED IN PART AND DENIED IN PART; ONDA's motion for summary judgment is DENIED; OCA's motion to dismiss is GRANTED IN PART AND DENIED IN PART. I dismiss this case without prejudice. Therefore, all other pending motions are DENIED as moot.

My disposition of each of ONDA's claims, including those pleaded in the alternative, rests on jurisdictional grounds. Specifically, the facts in this case and a recent United States Supreme Court decision, <u>Norton v. Southern Utah Wilderness Alliance</u> ("<u>SUWA</u>"), 124 S.Ct. 2373 (2004), lead me to conclude that jurisdiction does not exist for ONDA's claims. I will briefly summarize the reasons for my conclusion.

As to my jurisdiction to review the Forest Service's decision to issue an Annual Operating Instruction ("AOI"), Judge Garr King ruled at a preliminary stage of this case that an AOI was a final agency action capable of judicial review under federal administrative law. In making that ruling, Judge King had only a sample AOI and term grazing permit but no administrative record. In confirming this court's jurisdiction over this matter I have reconsidered that ruling with the benefit of a full and voluminous administrative record on summary judgment. There is a panoply of resource and wildlife management documents and decisions in the record that do, and do not, affect the legal framework for the Forest Service in administering grazing in the Malheur National Forest. I find that the record belies the AOI's legal significance for the Forest Service and therefore conclude that the AOI is not final agency action but rather agency action that implements final decisions. Thus, this court has no jurisdiction to review the Forest Service's

expert considerations in issuing an AOI that merely implements Forest Service obligations established in final agency decisions.

Nor may I reach beyond the Supreme Court's recent decision in <u>SUWA</u> clarifying a court's jurisdiction over claims that allege a federal agency's failure to implement federal environmental laws. The specific statutory language cited by ONDA as the basis for its claims is indistinguishable from the language considered by the Supreme Court and found to be too general a statutory duty to allow a court to compel performance of that duty. Thus, jurisdiction is lacking for ONDA's failure to act claims.

Finally, ONDA's attempt to compel environmental analyses for the affected grazing allotments is preempted by successive Congressional session laws that, in part, apply to term grazing permits. Specifically, Congress has given the Forest Service extra time to perform the required environmental assessments according to available funding and the agency's triage priority.

My specific findings on each of these issues follows.

I.    PROCEDURAL BACKGROUND

In February 2003 ONDA filed for declaratory and injunctive relief from the Forest Service's current and past decisions to issue numerous AOIs for grazing on federally-owned pastures that affect protected riparian areas of either the North Fork Malheur River or the Malheur River within the Malheur National Forest. Specifically, ONDA alleged that the AOIs violated the GM-1 Grazing Management standard of the Inland Native Fish Strategy ("INFISH") aquatic plan to "[m]odify grazing practices * * * that retard or prevent attainment of Riparian Management Objectives or are likely to adversely affect inland native fish." Supplemental Policy

Administrative Record ("SPAR") 0031. The Forest Service moved to dismiss ONDA's claims, arguing that certain claims lacked a final, reviewable agency action and that the remaining claims failed to assert a duty sufficiently discrete for the court to compel specific performance.

Judge King denied the Forest Service's motion to dismiss ONDA's claims on both issues. See Oregon Natural Desert Ass'n v. U.S. Forest Service, 312 F.Supp.2d 1337 (D. Or. 2004). Specifically, Judge King found that the Forest Service had failed to perform its statutory duty to implement management plans for the protected wild and scenic sections of the Malheur and North Fork Malheur rivers. See id. at 1344-46. Further, Judge King found that an AOI was a final agency action with legal consequences to the permittee because, for example, the AOI implemented standards given in bull trout biological opinions that post-dated the underlying term grazing permit. See id. at 1343.

The parties then filed cross-motions for summary judgment on an extensive administrative record that included resource and wildlife management policy documents and monitoring documentation pertaining to six affected federal grazing allotments over the past four years.

II.    DISPOSITIVE MOTIONS

A.    ONDA's Motion for Summary Judgment.

Three federal environmental statutes provide the bases for ONDA's claims: the Wild and Scenic Rivers Act of 1968 ("WSRA"), 16 U.S.C. §§ 1271-1287, the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600-1614, and the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4370d.

However, none of these statutes - WSRA, NFMA, NEPA - provide a private right of action.[1] Thus, ONDA must challenge each of the AOIs under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq.,* as a final agency decision that is subject to judicial review. Also under the APA, ONDA seeks to compel the Forest Service to conduct environmental analyses. I will address, in turn, these two types of APA challenges made by ONDA.

First, ONDA argues under Section 706(2)(A) of the APA that each AOI was a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). ONDA alleges that each AOI fosters chronic and continued unlawful violations of the INFISH GM-1 standards which requires the Forest Service to modify grazing to meet Riparian Management Objective ("RMO") standards for pool frequency, water temperature, bank stability, lower bank angle, and width/depth ratio. See SPAR 0026. Further, ONDA alleges that the AOIs' ecological monitoring standards do not comply with applicable resource management plans as required by WSRA, and the AOIs' monitoring standards fail to "protect and enhance" identified resource values in the North Fork Malheur and Malheur river wild and scenic corridors under WSRA. Next, ONDA alleges that each AOI is unlawfully inconsistent with the Forest Plan as required by NFMA.[2] Finally, ONDA

---

[1]See Ctr. for Biological Diversity v. Veneman, 394 F.3d 1108, 1110 (9th Cir. 2005) (no private right of action in the Wild and Scenic Rivers Act of 1968 ("WSRA"), 16 U.S.C. §§ 1271-1287); Ecology Ctr., Inc. v. United States Forest Serv., 192 F.3d 922, 924 (9th Cir. 1999) (no private right of action in National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600-1614); Cantrell v. City of Long Beach, 241 F.3d 674, 679 n. 2 (9th Cir. 2001) (no private right of action in National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4370d).

[2]Additionally, ONDA alleges that each Annual Operating Instruction ("AOI") violates Section 1604(I) of NFMA. "Judicial review of agency decisions under [NFMA] is governed by
(continued...)

alleges that each AOI was unlawful because an updated environmental analysis of the effects of grazing on the allotments at issue did not occur pursuant to NEPA. Thus, ONDA contends that the AOIs should be found unlawful and set aside, thereby causing grazing to be suspended on all six allotments.[3] See 5 U.S.C. § 706(2).

Second, pursuant to Section 706(1) of the APA ONDA seeks to "compel agency action unlawfully withheld or unreasonably delayed" in that the Forest Service has not updated the environmental analyses required under NEPA for the affected six allotments. 5 U.S.C. § 706(1). ONDA seeks Forest Service compliance with an agency schedule for performing NEPA analyses that was established under Section 504(a) of the Rescissions Act, Pub. L. No. 104-19, 109 Stat. 194-240 (1995). In the alternative, ONDA seeks to compel the Forest Service to implement through the challenged AOIs WSRA comprehensive river management plans and protect and enhance identified river values of the North Fork Malheur and Malheur rivers.[4]

---

[2](...continued)
the Administrative Procedure Act, which specifies that an agency action may only be overturned when it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Earth Island Inst. v. United States Forest Serv., 351 F.3d 1291, 1300 (9th Cir. 2003) (quoting Section 706(2)(A)). Thus, ONDA's NFMA claim is denominated as a Section 706(2)(A) claim.

[3]ONDA challenges four years of AOIs from 2000 up to and including the eleven AOIs issued in 2004 for the affected allotments. The Forest Service argues that claims against AOIs issued prior to the current year, 2004, are moot because the grazing season has passed, thus making the abatement remedy impossible. Based on my disposition of this case on jurisdictional grounds, I do not address the issue of mootness for the AOIs issued from 2000 through 2003 for the affected allotments.

[4]In the operative complaint, ONDA pleaded Section 706(1) in the alternative to a Section 706(2)(A) theory for Claims One, Two and Four. In its motion for summary judgment ONDA argues Section 706(1) in chief for Claim Four.

Based on these claims, ONDA seeks declaratory relief and an order enjoining grazing on the six allotments affected by the challenged AOIs, i.e., "nothing less than complete rest for multiple years," to allow for ecological recovery of the two protected river corridors. Plfs' Mem. In Support Of Summary Judgment, p. 42.

B.     The Forest Service's Motion for Summary Judgment.

The Forest Service, in turn, moves for summary judgment on procedural grounds and, in the alternative, on the merits of ONDA's WSRA and NFMA claims. The Forest Service first alleges that ONDA fails to establish jurisdiction by merely challenging resource conditions that do not comply with resource management standards and by not challenging a final agency action as required under Section 706(2)(A). The Forest Service denies that it is subject to the alleged statutory duties because the permittee, not the Forest Service, has the duty to comply with an AOI. Further, the Forest Service asserts that ONDA fails to establish jurisdiction to assert a failure to act claim under Section 706(1) because there is no statutory duty to enforce strict AOI compliance. In the alternative, the Forest Service argues that the challenged AOIs comply with resource monitoring requirements under NFMA and WSRA, and satisfy the Forest Service's duty to protect and enhance each river corridor's resource values under the WSRA.

Finally, as to ONDA's claim to compel an updated NEPA review, the Forest Service argues that recent Congressional session laws place such a remedy beyond the power of the courts by accommodating agency delay in performing required NEPA analyses.

C.    <u>Intervenor-defendant Oregon Cattlemen's Association's Motion to Dismiss and Motion for Summary Judgment</u>.

On behalf of most of the permittees with 2004 AOIs for the six allotments, the OCA moves to dismiss those claims that ONDA brings under Section 706(1) for the Forest Service's failure to act: the NEPA claim and, in the alternative, the WSRA claims for failing to be in compliance with applicable plans and failing to protect and enhance resource values. Those claims, OCA argues, should be dismissed for a lack of jurisdiction under the Supreme Court's holding in <u>SUWA</u> for not challenging a "discrete" agency action required under the applicable federal environmental laws, <u>e.g.</u>, WSRA and NEPA. <u>See</u> <u>SUWA</u>, 124 S.Ct. at 2379. Further, OCA argues that ONDA fails to allege specific violations for each of the eleven current AOIs. In the alternative, assuming that ONDA's AOI challenges are valid, OCA contends that ONDA failed to exhaust administrative procedures to contest each AOI.

The OCA also seeks summary judgment. The OCA argues that legally enforceable standards are not a part of the Malheur National Forest plan, the comprehensive river management plans, the INFISH aquatic plan or the bull trout biological opinions and assessments. According to OCA, these plans and opinions provide policy objectives and are merely guidance documents. While the AOIs comply with the plans' guidance, the enforceable standards applicable to an AOI are contained in the Code of Federal Regulations, <u>i.e.</u>, 36 C.F.R. Part 222 Range Management - and the individual term grazing permits. Therefore, OCA argues, the AOIs are not unlawful because the plans and opinions carry no legal obligation.

D.    Intervenor-defendant Robertson Ranch's Motion for Partial Summary Judgment as to the Ott Allotment AOI.

Robertson Ranch seeks partial summary judgment as to its specific 2004 AOI for the Ott Allotment based, in part, on a stipulated grazing program that resulted from ONDA's prior motion for preliminary injunction. Within the Ott Allotment, only the Rattlesnake pasture provides livestock access to protected riparian areas on the North Fork Malheur River. Robertson Ranch alleges that it fenced-off access to the area pursuant to the stipulation, and whether the fence was in disrepair at the end of the grazing season does not mean that the fence was not functional during the grazing season. Additionally, Robertson Ranch argues that the monitoring record for the Ott Allotment does not support ONDA's assertion that the AOI is unlawful.

III.    STANDARD OF REVIEW

Summary judgment is proper if the record before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.C.P. 56(c). However, under the APA the agency resolves material fact issues to arrive at a decision that must be supported by the administrative record lodged with a reviewing court. See City & County of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997). Thus, when reviewing an appeal of an agency's administrative decision, the court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

As a court of limited jurisdiction, a federal court's first duty is to find jurisdiction to hear a claim. See Spencer Enters. v. United States, 345 F.3d 683, 687 (9th Cir. 2003) (court has "duty to consider subject matter jurisdiction sua sponte in every case"). Jurisdiction to hear an

administrative claim is an independent determination that is separate from the standing granted under the APA to bring an administrative claim. See Andrus v. Charlestone Stone Products Co., 436 U.S. 604, 608 (1978); Cornejo-Barreto v. Seifert, 218 F.3d 1004, 1015 (9th Cir. 2000). Therefore, subject-matter jurisdiction for administrative claims must be found in the organic statute. See 28 U.S.C. § 1331.

IV.    DISCUSSION

A.    Jurisdiction under Section 706(2)(A) of the Administrative Procedures Act.

Section 706(2) of the APA authorizes courts to "hold unlawful and set aside agency action * * * found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). A ten-year grazing permit is a government license under the APA. See Anchustegui v. Dep't of Agric., 257 F.3d 1124, 1128 (9th Cir. 2001). An AOI is an agency action because it is made part of the grazing permit.[5]

---

[5]Despite a change in form for the actual 2004 AOIs, the AOI has functioned, and continues to function, as a supplemental part of the grazing permit. For example, the four AOIs issued for years 2000 through 2003 for the North Fork Allotment included three statements on the relationship of the AOI to the grazing permit:

> The Annual Operating Instruction (AOI) [or Plan (AOP)] is used in addition to your Term Grazing Permit.
> * * *
> All requirements of your Term Grazing Permit remain in force, unless specifically noted in the AOI [or AOP].
> * * *
> 11. REVISIONS This Annual Operating Instruction [or Plan] is made part of Part 3 of your Term Grazing Permit.

(continued...)

Where no private right to challenge agency action is provided in the statute, the APA

confers a right of judicial review for **"final** agency action." 5 U.S.C. § 704 (emphasis added); <u>see</u>

<u>also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 882 (1990) ("When, as here, review is sought

not pursuant to specific authorization in the substantive statute, but only under the general review

provisions of the APA, the 'agency action' in question must be 'final agency action'.") (quoting

Section 704). Whether judicial review is available for the Forest Service's decision to issue an

AOI as a final agency action is an issue of first impression in federal court.

1.      <u>Judicial review of an AOI: "finality" under Bennett v. Spear</u>.

The Supreme Court applies a two-part inquiry to determine whether an agency decision is

"final":

> As a general matter, two conditions must be satisfied for agency action to be "final":
> First, the action must mark the "consummation" of the agency's decisionmaking
> process--it must not be of a merely tentative or interlocutory nature. And second, the
> action must be one by which "rights or obligations have been determined," or from
> which "legal consequences will flow" * * * .

<u>Bennett v. Spear</u>, 520 U.S. 154, 177-178 (1997) (internal citations omitted); <u>Alaska v. United</u>

<u>States EPA</u>, 244 F.3d 748, 750 (9th Cir. 2001).

The finality test in <u>Bennett</u> looks to the decision-making context to find a final agency

position on an issue, and whether any legal consequences result as a practical effect of the

---

[5](...continued)
Administrative Record ("AR") North Fork ("NF") 568, 572 (2003 AOI); <u>see</u> <u>also</u>, AR NF 480,
486 (2002 Annual Operating Plan ("AOP")); AR NF 322, 328 (2001 AOP); AR NF 248, 254
(2000 AOP). In the 2004 AOIs, the Revision section that explicitly made the AOI part of the
permit was dropped from the grazing permit while the first two sentences were left intact. <u>See</u>
AR NF 686.
        I am aware of no change in Forest Service authority accompanying the change in form
that would lead to the conclusion that the relationship of the AOI to the grazing permit changed
with the general form change.

agency's decision. For example, while an agency may not acknowledge a decision as a final action, the practical effect of the decision may carry legal consequences, thereby making it a reviewable final agency action. See e.g., Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1034 (9th Cir. 2001) (Holding that a biological opinion was final, in part, because "[a]s a practical matter, the opinion and its accompanying Incidental Take Statement grant immunity to the proposed actions of other agencies" as a legal consequence); Alaska, 244 F.3d at 750 (EPA order suspending a construction permit gave the EPA the right to seek criminal and civil penalties if the order was violated).

Thus, a final agency action "alter[s] the legal regime to which the **action agency is subject**," i.e., prior existing "rights and obligations" are reworked or "legal consequences will flow" from the agency action. Bennett, 520 U.S. at 178 (emphasis added). Specifically, whether an AOI is a final action depends on the AOI's effect on the Forest Service grazing permit system, not whether the consequences to the permittee are "fairly traceable to the [Forest Service's] action [issuing the AOI]." Id. at 177. In other words, any AOI is an agency action affecting the permittee as a day-to-day operating instruction. An agency action must do more than affect the permittee to be final: under Bennett, it must alter the legal regime that the Forest Service administers through the basic terms, standards and conditions of the grazing privilege.

2.  An AOI is not a final agency decision because it carries no legal consequences for the Forest Service.

Applying Bennett to the administrative record in this case, I find that an AOI is not a final agency action because it does not alter the legal regime of a grazing permit by authorizing the Forest Service to deviate from the grazing permit's basic terms and standards or amending legal

mandates. See Bennett, 520 U.S. at 178. First, an AOI does not alter the Forest Service's legal relationship established in the term grazing permit with a permittee. An AOI implements yearly changes to those mandates as binding, conditional obligations of the term grazing permit and federal regulations. Second, an AOI's basic terms and standards merely implement INFISH aquatic plan and bull trout Biological Opinion (BiOp) legal mandates for the Forest Service's grazing allotment program. I address each point in turn using the North Fork Allotment AOI as an exemplar for all of the challenged AOIs.

a.      The Forest Service's legal relationship with permittees.

Livestock "grazing privileges" on federal land are authorized by permit for a term of years, subject to terms and standards under the Federal Land Policy and Management Act of 1976, 16 U.S.C. §§ 1701 *et seq*. See 43 U.S.C. § 315b. Specifically, the Forest Service issues ten-year grazing permits to private ranchers for grazing livestock within national forest areas. See 43 U.S.C. § 1752(a); 36 C.F.R. 222.1(b)(5)(ii). The Forest Service has the authority "to cancel, suspend, or modify a grazing permit * * *, in whole or in part, pursuant to the terms and conditions thereof, or to cancel or suspend a grazing permit * * * for any violation of a grazing

regulation or of any term or condition of such grazing permit."[6] 43 U.S.C. § 1752(a); 36 C.F.R. 222.1(b)(10) ("Modify means to revise the terms and conditions of an issued permit.").

The Forest Service may cancel or suspend a permit for noncompliance after giving the permittee notice and an opportunity to challenge the suspension or revocation. See 36 C.F.R. 222.4(a)(4); see also, Anchustegui v. Dep't of Agric., 257 F.3d at 1128 (grazing permit is a license under 5 U.S.C. § 558 with due process protection). While a permittee has a presumption for renewal of a ten-year permit, that renewal is conditioned upon having "fully complied with the terms and conditions of the expiring permit." 36 C.F.R. 222.3(c)(1)(ii). Additionally, the Forest Service may "[c]ancel the permit in the event the permittee * * * [r]efuses to accept modification of the terms and conditions of an existing permit." 36 C.F.R. 222.4(a)(2)(I). Modifying the number, kind or class of livestock, the allotment to be used or the period of use - in other words, the five basic permit terms - requires a one year notice before becoming effective. See AR NF 265; see also 36 C.F.R. 222.4(a)(8).

Further, a permit may be modified by cancelling the permit "at the end of the calendar year of the midyear of the decade (1985, 1995, etc.), provided [the permit is] reissued to the existing permit holder for a new term of 10 years." 36 C.F.R. 222.3(c)(1)(iii). However, every

---

[6]For example, the standard permit language states that the terms may be modified

> at any time during the term to conform with needed changes brought about by law, regulation, Executive order, allotment management plans, land management planning, numbers permitted or seasons of use necessary because of resource conditions, or the lands described otherwise being unavailable for grazing.

AR NF 263 (North Fork Term Grazing Permit); see also 36 C.F.R. 222.4(a)(7) (Changes in an allotment's resource conditions or changes in the law, rules, management plans may cause the Forest Service to modify a grazing permit).

year the Forest Service may determine that an allotment is not ready for grazing, and grazing on that allotment may be held in abeyance to avoid further resource damage. See AR NF 265.

In summary, the grazing permit bestows grazing privileges upon a permittee that are conditional on any subsequent changes in law or applicable resource plans. AOI standards implement those changes but do not create them. A permittee has a presumption of permit renewal unless the permittee fails to comply with a permit condition or requirement contained in an AOI.

Issuing an AOI does gain the Forest Service additional enforcement rights against a permittee beyond those in the grazing permit. A final agency action carries legal consequences, in part, by affecting the agency's enforcement rights. See Alaska, supra, 244 F.3d at 750. In Alaska, the Environmental Protection Agency ("EPA") issued an order to halt construction of a mine facility. The Ninth Circuit found that the EPA's Order was a final agency action, in part, because issuing the Order was an agency action that activated the EPA's enforcement rights by requiring compliance in the face of criminal and civil penalties. Further, the Order affected the builder's right to construct the facility at "considerable cost of both time and money." Id. at 751.

In contrast to the EPA Order at issue in Alaska, the issuance of a Forest Service AOI does not change the enforcement posture of the Forest Service or alter the conditional nature of the permittee's grazing privileges. The Forest Service is not penalizing the permittee by issuing an AOI. A grazing permit requires compliance with operating instructions which are issued as AOIs. In practice, grazing violations are enforced against a permit's basic terms as penalized reductions

in grazing privileges.[7] The Forest Service implements legal obligations through an AOI but does not encroach on a permittee's conditional grazing privileges by issuing the AOI. Therefore, issuing an AOI does not alter the legal regime for administering a grazing permit and thereby, is not a final agency action subject to review.[8]

b.    An AOI implements resource and wildlife management mandates.

While there is no law or regulation defining the AOI, its practical use is as a feedback mechanism for implementing the grazing permit standards.[9] An AOI modifies the grazing permit "to meet [the Forest Service's] management and vegetative objectives for the allotment," but

---

[7]For example, in Anchustegui v. Dep't of Agric., 257 F.3d 1124, 1128 (9th Cir. 2001), the Forest Service sought to cancel Anchustegui's 1996 grazing permit for violations of Forest Service instructions, AOI directives, and numerous grazing requirements. 257 F.3d at 1127. Past violations had resulted in a 20 percent permit suspension in 1985 for grazing outside the boundaries, a 30 percent permit cancellation in 1989 for grazing out of season, and in 1993, a 62 percent permit cancellation "for grazing outside of the boundaries and failure to follow Forest Office instructions and AO[I] directives." Anchustegui, 257 F.3d at 1127. These facts show that the Forest Service acted to enforce the grazing permit. The AOI was a management tool that indicated when a violation occurred independent of any legal consequence for the violation *per se*.

[8]While it is tempting to analogize a Forest Service decision to issue an AOI to a Forest Service decision to make a timber sale, that analogy is inapposite. Timber sales are final agency decisions because they reflect the decision to sell a site-specific right to harvest timber based on land management factors. By analogy, an AOI does not confer a right to graze - that right exists with the grazing permit. The AOI implements the grazing right, more analogous to the manner in which timber is harvested, not the decision to confer the right to harvest.

[9]The Forest Service argues that the dearth of AOI regulation shows that the AOI is not a final agency action with legal consequences. The Forest Service asserts that neither AOIs nor their predecessor annual operating plans are referenced in federal statutes or regulations, and are only twice mentioned in the Forest Service Manual as an implementation tool and part of the term grazing permit. See Defs' Reply, p.6.

However, the lack of procedural protections could be read in an opposite manner, i.e., the lack of AOI regulation in the face of an AOI having legal consequences shows that the Forest Service is not providing the process due for an AOI if it is a final agency action. Therefore, this argument has no traction to advance the argument.

"[a]ll requirements of [the underlying grazing permit] remain in force." AR NF 686 (North Fork

2004 AOI). For the six challenged allotments, those objectives derive from the 1995 INFISH

aquatic plan and annual BiOps on the effects of proposed AOI for grazing in bull trout habitat.[10]

An AOI contains standards and conditions from the INFISH plan and bull trout BiOps to achieve

consistency between allotment resource conditions and the applicable resource plans as required

in the term grazing permit. See e.g., AR NF 267 (2004 AOI for the North Fork Allotment). The

following review of the standards and conditions in a sample AOI shows that the resource

management standards derive from mandates outside the AOI and therefore, the AOI

implements, but does not *per se* alter, a permittee's obligations.

The AOI is "used to set objectives, implement utilization standards, and modify grazing

systems (if necessary) to meet [the Forest Service's] management and vegetative objectives for

the allotment." AR NF 686. For example, 195 cattle cow-calf pairs may graze the Squaw Creek

unit from June 16, 2004, to July 25, 2004; the same number may graze on the Squaw Creek

Holding for July 22-27, 2004; 255 cattle cow-calf pairs on the Mountain unit from June 21, 2004,

---

[10]Other planning documents provide general guidance on resource management. The
Malheur National Forest plan ("Forest Plan") establishes forest-wide grazing range standards for
Non–Anadromous Riparian Areas–Management Area 3A ("MA3A"), including a percentage
level of allowable utilization of available forage. See Supplemental Policy Administrative
Record ("SPAR") 0001 (Land and Resource Management Plan - Malheur National Forest 1990,
Ch. IV, 55-61). A subsequent 1994 amendment to MA3A of the Forest Plan, Amendment #29,
added Fish, Water Quality, and Wildlife numerical standards on a subwatershed-scale basis for
sediment/substrate, water quality, channel morphology and riparian vegetation. See Policy
Administrative Record ("PAR") 870-884.

In 1993, the comprehensive river management plans for the North Fork Malheur and
Malheur rivers replaced the Wild and Scenic River–Management Area 22 section of the Forest
Plan with grazing utilization guidelines allowing intensive management strategies according to
existing resource conditions and mitigated impacts on recreationists. See PAR 495-499, 509
(Malheur Wild and Scenic River Management Plan); PAR 245-248, 257 (North Fork Malheur
Scenic River Management Plan).

to August 1, 2004; and the Camp Creek, Anderson Creek Riparian, and Bear Creek Meadows units are "rested" for the 2004 grazing season, i.e., they will not be grazed. AR NF 686. The 2004 AOI included permit modifications: the actual 2004 period of use was three days earlier than in the grazing permit, and the number of livestock on the allotment at any one time is above the permitted number. The Forest Service agreed to these variances that remain within the term grazing permit's total productivity limit, denominated in Animal Unit Months, for the allotment.[11]

Allotment management occurs through resource monitoring standards and pasture moves based on "move triggers" that occur prior to reaching a maximum level of use, e.g., a seven-inch stubble height is a move trigger for a six-inch utilization standard. The North Fork utilization standards for the 2004 grazing season were:

- 6 inches of residual stubble height

- 10% stream bank alternation for streams containing listed species;

- 0-35% utilization of grass/grass-likes and zero-30% utilization for shrubs based on weight and twig length for riparian areas;

- 0-35% utilization of forage for grasslands with less than 5% shrub cover;

- 0-30% utilization of forage for shrub areas with greater than 5% shrub cover.

---

[11]A calculation of an allotment's or pasture's vegetative productivity, called a "stocking rate" and calculated in Animal Unit Months, or "AUMs," determines the sustainability of livestock on a particular allotment or pasture. An AUM is a measure of grazing intensity, i.e., a pasture that has available 2,000 AUM of forage can support up to that AUM equivalent of cattle. Discussion in the briefing turns to AUMs when describing alleged chronic overuse of pastures beyond sustainable AUM limits. For example, a total of 2,455 AUMs are permitted on the North Fork Allotment, yet only 1,316 AUMs were available for the 2004 grazing season. See PAR 6651. Thus, a stocking rate limits the grazing permit's basic terms.

AR NF 688. Further, the Forest Service periodically inspects allotments to determine permittee compliance these standards. See PAR 6651-6652 (North Fork Allotment Multiyear monitoring summary).

The AOI resource monitoring standards described above derive from standards given in the INFISH plan and annual bull trout BiOps. See PAR 3369 (2000 Grazing Monitoring Module implementing "INFISH-amended LRMPs [e.g., the Forest Plan] and the attendant * * * bull trout Plan-level Biological Opinions"). The INFISH aquatic plan provides landscape-scale numerical standards for Riparian Management Objectives ("RMOs") of pool frequency, water temperature, bank stability, lower bank angle, and width/depth ratio. See SPAR 0026. The RMO numerical standards are attainment goals that are to be effectively pursued through the grazing allotment management, i.e., the AOI. The AOI implements the INFISH RMOs through bank alteration and residual vegetation monitoring.[12] Similarly, the Fish and Wildlife Service ("FWS") issues annual bull trout BiOps on the Forest Service's annual Biological Assessment for proposed grazing activities. See e.g., PAR 6731-6814 (2004 BiOp); PAR 6599-6671 (2004 Biological Assessment). Management guidelines in the 2004 BiOp include residual stubble heights and

---

[12]Plaintiffs dispute the scientific validity of monitoring residual vegetation as a proxy for stream recovery, e.g., pool frequency, width/depth ratio, and, in part, water temperature. The Forest Service's 2000 Grazing Monitoring Module summarizes the reasons for using proxy measurements:

> [Research] showed a linkage between residual vegetation height and recovery of streamside and instream characteristics beneficial to salmonids. These characteristics included; channel width, depth, streambank stability, embeddedness, streamside willows, plant species richness, plant community-types, plant cover and litter, and plant height.

PAR 3414. Regardless of the scientific validity of such proxy measures, the standards being measured derive from the INFISH RMOs and BiOp standards and are implemented in the AOI.

move triggers, shrub utilization levels, bank alteration limits, and the exclusion of grazing in riparian habitat during bull trout spawning season. See PAR 6737. The AOI's standards apply these BiOp guidelines along with the INFISH RMOs. Therefore, I conclude that the AOI implements resource standards that are made binding on the Forest Service through the INFISH plan and bull trout BiOps.

In conclusion, a grazing permit authorizes changes and modifications to its basic terms and standards to reflect changes in the law or resource conditions. An AOI may implement any resource management changes arising from changes in the law or resource condition. It is putting the cart before the horse to say that an AOI changes the legal regime that the Forest Service operates under in administering the grazing permit system. The AOI implements the grazing permit system that accommodates changes in basic terms, standards and conditions based on changes in the law or resource condition, e.g., the INFISH aquatic plan and bull trout BiOps. The AOI is a resource management tool that operates within the permittee's rights and obligations as defined in the grazing permit and applicable regulations for grazing a certain allotment. It is not a substantive legal standard.

I find that an AOI is not an agency action that is final and therefore, I dismiss for a lack of jurisdiction ONDA's Section 706(2)(A) claims attacking the Forest Service's issuance of AOIs.

B.    Jurisdiction under Section 706(1) of the Administrative Procedures Act for failure to act.

In the operative complaint, ONDA pleaded their WSRA-related claims in the alternative under APA Section 706(1), alleging the Forest Service's delay and failure to implement statutory mandates. Specifically, ONDA alleged that the Forest Service (1) failed to implement Comprehensive River Management plans required under the WSRA for the North Fork Malheur

and Malheur rivers, see 16 U.S.C. § 1274(d)(1) (the Forest Service "shall prepare a comprehensive management plan * * * to provide for the protection of the river values"), and (2) failed to "protect and enhance" designated river resource values, see 16 U.S.C. § 1281(a) (the Forest Service "shall * * * administer[] [the Comprehensive River Management plan] in such manner as to protect and enhance the values which caused [the river] to be included in said [protected] system"). Additionally, ONDA alleges that the Forest Service is required to perform a NEPA analysis for the protected areas of North Fork Malheur and Malheur rivers and that in failing to conduct a NEPA analysis, the Forest Service must be compelled under Section 706(1) to perform those analyses. I address the WSRA claims first, then turn to the NEPA claim.

1.      Failure to implement Wild and Scenic River Act mandates.

        Intervenor-defendant OCA moves to dismiss ONDA's two WSRA-related claims for lack of jurisdiction in light of the recent Supreme Court ruling in SUWA that clarified the jurisdictional requirements for bringing a failure to act claim under Section 706(1).[13] The Section 706(1) jurisdictional rule from SUWA is that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a **discrete** agency action that it is **required to take**." Id. at 2379 (emphasis in original). A discrete agency action is an "agency rule, order, license, sanction [or] relief" or a circumscribed equivalent thereof. Id. at 2378 (citing 5 U.S.C. § 551(13), the definition of "agency action") (internal quotation omitted). The necessary statutory

_____

        [13]This was a second issue addressed in Judge King's prior ruling, see Oregon Natural Desert Ass'n v. U.S. Forest Service, 312 F.Supp.2d 1337, 1344 (D. Or. 2004) that applied Mont. Wilderness Ass'n v. U.S. Forest Service, 314 F.3d 1146 (9th Cir. 2003), vacated and remanded by Veneman v. Mont. Wilderness Ass'n, 124 S. Ct. 2870 (2004). In light of the Supreme Court vacating the Ninth Circuit precedent underlying Judge King's legal analysis, I apply the Supreme Court's holding in Norton v. Southern Utah Wilderness Alliance, 124 S.Ct. 2373 (2004) to my present analysis.

mandate for action must be in the nature of "the so-called prerogative writs–principally writs of mandamus" to compel a duty to perform an action. Id. at 2379.

In SUWA, plaintiffs alleged that the Bureau of Land Management ("BLM") violated a statutory mandate, that the BLM "**shall * * * manage** such lands according to [its] authority under this Act and other applicable law **in a manner so as not to impair** the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c) (emphasis added); SUWA, 124 S.Ct. at 2380. The SUWA Court found that "Section 1782(c) is mandatory as to the object to be achieved, but it leaves BLM a great deal of discretion in deciding how to achieve it." SUWA, 124 S.Ct. at 2380. In other words, the commanding statutory terms, "shall * * * manage," clearly compel a duty to manage the lands as wilderness, but the statute leaves the BLM free to manage that duty "in a manner" it sees proper in its expert opinion to sustain suitability for wilderness protection. See also Ctr. for Biological Diversity v. Veneman, 394 F.3d 1108, 1113 (9th Cir. 2005) (A "duty 'to consider' may be more specific and less discretionary than the duty [addressed in SUWA] 'to manage'" but still fails to provide a discrete agency action). The SUWA Court declined to read the Section 1782(c) mandate to compel "nonimpairment" because such an order would be a general duty and not a discrete agency action to be performed such as issuing an agency rule, order or license. Id. at 2381 ("General deficiencies in compliance * * * lack the specificity requisite for agency action."). Further, "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA." Id. at 2381.

The three WSRA mandates for the Forest Service asserted by ONDA suffer from the same lack of discreteness as the Section 1782(c) mandate in SUWA. First, Section 1274(d)(1)

requires the Forest Service "to prepare a comprehensive management plan," which the Forest

Service has done for both the North Fork Malheur River and the Malheur River. However,

ONDA seeks to compel the Forest Service to "provide for the protection of the river values, * * *

address resource protection * * * and other management practices necessary or desirable, * * *

[and] * * * coordinate[] with * * * resource management planning for affected adjacent Federal

lands" in the two river management plans. 16 U.S.C. § 1274(d)(1). The duties "to provide for

protection * * * address resource protection * * * and [to] coordinate[]" are general duties apart

from any discrete agency act.

Second, the mandate of Section 1283(a) requires agency action but merely towards the

general duty "to protect." 16 U.S.C. § 1283(a) (The Forest Service "shall take such action

respecting management policies, regulations, contracts, plans, affecting such lands * * * as may

be necessary to protect such rivers in accordance with the purposes of this chapter."). Finally,

Section 1281(a) creates a general duty to manage the protected rivers "in such a manner as to

protect and enhance the values" that caused it to be identified as a protected resource. 16 U.S.C.

§ 1281(a). This statutory duty is indistinguishable from the statutory duty to manage "in a manner

so as not to impair" addressed by the SUWA Court.

Therefore, ONDA's WSRA claims must fail under weight of the SUWA Court's holding

that such general duties do not create a discrete agency action susceptible to Section 706(1)

jurisdiction for court review.

2.    Failure to conduct NEPA analyses.

Next, ONDA alleges that the Forest Service has failed to conduct required NEPA

environmental analyses prior to reissuing grazing permits affecting the six allotments at issue.

The Forest Service concedes that a NEPA analysis is required for the re-issuance of grazing permits, but argues that Congress has postponed the time deadline for performing NEPA analyses to address a backlog of needed NEPA analyses. ONDA, in turn, argues that the Forest Service has taken advantage of the postponement to improperly delay conducting NEPA analyses for the affected grazing permits.

I begin my analysis of this issue by first noting that NEPA "is a procedural statute that requires the Federal agencies to assess the environmental consequences of their actions before those actions are undertaken." Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004). In the mid-1990's, the Forest Service became unable to complete timely NEPA analyses on a significant number of grazing permits coming up for renewal about the same time. See PAR 0886 ("Approximately 4,500 [of 9,197 total] permits will expire in 1995."). Congress enacted Section 504 of the Rescissions Act, Pub. L. No. 104-19, § 504, 109 Stat. 194, 212-13 (July 27, 1995), to provide relief to the agency and grazing permit holders.

Section 504 provided, in general, that the agency would establish a schedule for completion of NEPA analyses for all allotments within the National Forest System for which a NEPA analysis was needed, and that, "notwithstanding any other law, term grazing permits which expire or are waived before the NEPA analysis and decision pursuant to [this schedule] shall be issued on the same terms and conditions and for the full term of the expired or waived permit." 109 Stat. at 212.

Subsequent federal appropriations bills - two in 2003 and one in 2004 - allowed the re-issued grazing permits to remain in effect and enforceable despite lacking the required NEPA analysis. See Pub. L. No. 108-7, 117 Stat. 11, § 328 (Feb. 20, 2003); Pub. L. No. 108-11, 117

Stat. 559, § 2401 (April 16, 2003); Pub. L. 108-108, 117 Stat. 1241, § 325 (Nov. 10, 2003). The

authority to administer and manage the backlog was left with the applicable agency Secretary:

> * * * the Secretaries in their sole discretion determine the priority and timing for
> completing required environmental analysis of grazing allotments based on the
> environmental significance of the allotments and funding available to the
> Secretaries for this purpose * * *

108 Pub. L. 108, 325. Further, if an agency fell behind in its revised schedule for completing the

backlogged NEPA analyses, that delay should not invalidate a grazing permit. See H.R. Conf.

Rep. 108-76, *97-98 Ch. IV, § 2401 (April 12, 2003). Thus, Congress provided for continued

grazing on permitted federal allotments under otherwise invalid grazing permits by withholding

the need for the requisite NEPA analysis upon the re-issuance of a grazing permit.

Legal consequences remain for violations of a grazing permit's standards but not on the

basis of a failure to update a NEPA analysis. See H.R. Conf. Rep. 108-76, *98 ("The managers

emphasize that this provision does not prevent the Forest Service from taking appropriate action

consistent with agency policies and procedures to address violations of permit terms and

conditions."). The NEPA requirement for re-issuing a grazing permit has been held in abeyance

by Congress with instruction to federal agencies to work on reducing the backlog of NEPA

analyses. While a NEPA analysis for the six challenged allotments remains a requirement,

Congress has tolled the requirement to accommodate the realities of the Forest Service's

capabilities and therefore, ONDA's NEPA claim must fail.

V.    CONCLUSION

The Forest Service's decisions to issue AOIs to permittees that conduct grazing in

allotments that include protected riparian areas of the North Fork Malheur River and Malheur

River were agency actions, but not final actions subject to this court's review. Additionally,

applicable federal environmental laws that impose duties on the Forest Service related to the

grazing permit program do not require agency actions that are sufficiently discrete to allow a

court to compel specific performance. Finally, Congressional action to forestall grazing permit

cancellations for lacking a NEPA analysis prior to re-issuance forecloses a claim asserting a

failure to perform a NEPA analysis.

Based on the my analysis above, I GRANT IN PART AND DENY IN PART the Forest

Service's cross-motion for summary judgment. I DENY ONDA's motion for summary judgment,

and GRANT IN PART AND DENY IN PART OCA's motion to dismiss. I dismiss this case

without prejudice. Therefore, all other pending motions are DENIED as moot.

IT IS SO ORDERED.

DATED this 3rd day of June, 2005.

ROBERT E. JONES
U.S. District Judge