THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

OREGON NATURAL DESERT ASS'N,
et al.,
          Plaintiffs,

No. 3:03-cv-213-PK

v.

**FINDINGS AND
RECOMMENDATION**

UNITED STATES FOREST SERVICE,
et al.,

       Defendants,

      and

JEFF HUSSEY, et al.,

       Intervenor-Defendants.

**PAPAK, J.**

    Plaintiffs Oregon Natural Desert Association and Center for Biological Diversity bring

this action under the National Wild and Scenic Rivers Act (WSRA), 16 U.S.C. §§ 1271-1286,

and the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600-1614, against the United

Page -1-   FINDINGS AND RECOMMENDATION

States Forest Service and Roger W. Williams, Malheur National Forest Supervisor (collectively, the Forest Service). Several grazing permittees intervene as defendants (Intervenor-Defendants). Plaintiffs claim that the Forest Service's authorization of livestock grazing in pastures along the Malheur River and North Fork Malheur River corridors has caused the degradation of the riparian habitat of the threatened bull trout, reducing the adult bull trout population to a total of about 100 adult fish in the two watersheds at issue.

Since Plaintiffs filed this action in 2003, the parties have spent years in litigation and ultimately unsuccessful settlement negotiations. *See* Opinion and Order 2-3, ECF No. 399 (describing the history of this action up to 2016). The current operative pleading is the Fifth Supplemental and Amended Complaint, which Plaintiffs filed in March 2016. ECF No. 400.

The parties have now filed cross-motions for summary judgment. For the following reasons, I conclude that Plaintiffs' Motion for Summary Judgment, ECF No. 416, should be denied; Defendants' Amended Cross-Motion for Summary Judgment, ECF No. 482, should be granted; and Intervenor-Defendants' Corrected Cross-Motion for Summary Judgment, ECF No. 459, should be granted. I deny as moot Intervenor-Defendants' Corrected Motion to Strike Plaintiffs' Extra-Record Filings, ECF No. 458.

## BACKGROUND

Plaintiffs challenge the Forest Service's decisions over the past ten years to authorize livestock grazing on seven allotments in the Malheur National Forest. The seven allotments at issue[1] encompass tens of thousands of acres through which the Malheur River and the North Fork

---

[1] The Bluebucket, Dollar Basin/Star Glade, Central Malheur, Spring Creek, North Fork, Flag Prairie, and Ott allotments.

Page -2-  FINDINGS AND RECOMMENDATION

Malheur River run.

Plaintiffs contend that the Forest Service has failed to protect bull trout habitat from degradation in the watersheds of the Malheur River and North Fork Malheur River. The parties dispute whether the Forest Service's decisions to authorize livestock grazing on the seven allotments are consistent with its obligation to oversee the riparian habitats where bull trout live.

## I. Statutory Framework

### A. National Forest Management Act (NFMA)

NFMA requires that the Forest Service develop, maintain, and revise comprehensive Land and Resource Management Plans (Forest Plans) for National Forests. 16 U.S.C. § 1604(a). Under NFMA, the Forest Service must manage Forest System Lands to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B). In creating a Forest Plan, the Forest Service must "use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." *Id.* § 1604(b). After the Forest Service adopts a Forest Plan, "all subsequent agency actions must comply with it." *Oregon Wild v. Cummins*, 239 F. Supp. 2d 1247, 1266 (D. Or. 2017) (*Oregon Wild II*) (citing 16 U.S.C. § 1604(i)).

### B. National Wild and Scenic Rivers Act (WSRA)

The Wild and Scenic Rivers Act is intended to identify rivers that possess "outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values," and to preserve those rivers in free-flowing condition and protect them "for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271. The WSRA requires that

the Forest Service "prepare a comprehensive management plan . . . to provide for the protection

of the river values," that the plan "shall address resource protection, development of lands and

facilities, user capacities, and other management practices necessary or desirable to achieve the

purposes of this chapter," and that the plan "shall be coordinated with and may be incorporated

into resource management planning for affected adjacent Federal lands." 16 U.S.C. § 1274(d)(1).

### C. Endangered Species Act (ESA)

The Endangered Species Act (ESA) requires that all federal agencies "insure that any

action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

continued existence of any endangered species or threatened species or result in the destruction

or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2); 50 C.F.R.

§ 402.14(a). Although Plaintiffs do not bring a claim under the ESA, the ESA is relevant

because the United States Fish and Wildlife Service (FWS) has determined that the Columbia

River sub-population of bull trout found in the Forest is threatened. 63 Fed. Reg. 31647 (June

10, 1998).

Under the ESA, "Each Federal agency shall review its actions at the earliest possible time

to determine whether any action may affect listed species or critical habitats." 50 C.F.R. §

402.14(a). If the agency determines that its action could affect listed species or critical habitat of

listed species, the agency must "engage in informal or formal consultation with the Secretary of

the Interior or his designee." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d

1031, 1036 (9th Cir. 2015) (footnote omitted). The agency first prepares a biological assessment.

*Oregon Wild II*, 239 F. Supp. 3d at 1255. Depending on the findings of the biological

assessment, the agency then may either informally consult with the Secretary or the Secretary's

designee, or, if the proposed action is "likely to adversely affect" the species or its critical habitat, formally consult with the Secretary or the Secretary's designee (here, FWS). *Id.* (citing 50 C.F.R. § 402.14.(a) - (c)). A "formal consultation" requires that the Secretary or the Secretary's designee prepare a formal biological opinion (Bi-Op) to determine "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14.(g)(4). The record here contains several Biological Assessments prepared by the Forest Service and Bi-Ops prepared by FWS. *See, e.g.,* P 4Supp 02648-02811 (2012 Malheur National Forest Biological Assessment for Malheur River allotments); P 4Supp 02944 - 03101 (2012 FWS Bi-Op).

## II. Regulatory Framework

Pursuant to NFMA, the Malheur National Forest adopted a Forest Plan in 1990. The Forest Service amended the Forest Plan in 1994. The most relevant change here is Amendment 29, which modifies the Fish and Wildlife "resource elements" for riparian areas, incorporating a plan to achieve 90% river bank stability.

In 1995, the Forest Service adopted the Inland Native Fish Strategy (INFISH) as a strategy for managing watersheds to protect the habitat and populations of non-anadromous native fish, including bull trout. A nearly identical strategy, PACFISH, was adopted for anadromous fish. INFISH covers National Forest lands in Oregon, including the Malheur National Forest, as well as National Forest lands in eastern Washington, Idaho, western Montana, and parts of Nevada.

INFISH includes Riparian Management Objectives (RMOs), which set measurable

habitat guidelines. The Forest Service explained that the RMOs "provide the target toward which managers aim as they conduct resource management activities across the landscape. It is not expected that the objectives would be met instantaneously, but rather would be achieved over time." 2 SPAR 2472. There are six "landscape scale" RMOs: pool frequency, water temperature, large woody debris, bank stability, lower bank angle, and width/depth ratio. 2 SPAR 2474.

INFISH also includes Standards and Guidelines, directing the Forest Service's management of timber harvest, road-building, livestock grazing, and recreation in Riparian Habitat Conservation Areas. For livestock grazing, INFISH has four Standards and Guidelines, GM-1 through GM-4. Most relevant here is GM-1, which provides:

> Modify grazing practices (e.g., accessibility of riparian areas to livestock, length of grazing season, stocking levels, timing of grazing, etc.) that retard or prevent attainment of Riparian Management Objectives or are likely to adversely affect inland native fish. Suspend grazing if adjusting practices is not effective in meeting Riparian Management Objectives.

2 SPAR 2478.

"The Forest Service manages livestock grazing on an allotment by issuing a grazing permit; an allotment management plan (AMP); and an annual operating . . . instruction (AOI)." *Oregon Natural Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889, 902 (D. Or. 2012). Grazing permits authorize livestock use on federal lands, generally with a ten-year term, and set limits on timing and amount of use. *Id.*

Allotment Management Plans, or AMPs, are allotment-specific planning documents that prescribe how livestock operations will be conducted to meet multiple-use, sustained yield, economic, and other objectives. *Oregon Wild II*, 239 F. Supp. 3d at 1254. AMPs describe the

Page -6-   FINDINGS AND RECOMMENDATION

type, location, ownership, and general specifications for range improvements in place or to be installed and maintained to meet livestock grazing and other objectives. *Id.* (citing 36 C.F.R. § 222.1(b)(2)).

Annual Operating Instructions, or AOIs, are signed agreements issued annually by the Forest Service to grazing permittees setting "final authorized dates of grazing (the 'season of use'), pasture and grazing system rotations, numbers of livestock permitted for the upcoming season, monitoring and reporting requirements, and maximum limits of forage use by livestock." *Oregon Natural Desert Ass'n v. Kimbell*, No. 07-cv-1871-HA, 2008 WL 4186913, at *2 n.3 (D. Or. Sept. 5, 2008), *vacated in part on other grounds*, 2009 WL 1663037 (June 15, 2009).  AOIs must be consistent with the Forest Plan.  *Id.*

## III.  Factual Background

"The bull trout (*Salvelinus confluentus*) is a large freshwater char that is native to Washington, Oregon, Idaho, Montana and Nevada, as well as Canada and Alaska." *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1123 (D. Or. 1997).  In 1998, FWS listed the Klamath River and the Columbia River distinct population segments of bull trout as threatened under the ESA.  63 Fed. Reg. 31647 (June 10, 1998).  FWS determined that "[t]he decline of bull trout is primarily due to habitat degradation and fragmentation, blockage of migratory corridors, poor water quality, past fisheries management practices, and the introduction of non-native species." *Id.*, at 31647; *see also* 75 Fed. Reg. 63898, 63898 (Oct. 18, 2010) (revised determination noting additional factors contributing to the decline of the bull trout including climate change ).

In 2012, after receiving two Biological Assessments from Malheur National Forest, FWS

issued a Bi-Op on the effects of proposed livestock management on the bull trout and on bull

trout habitat in the Malheur National Forest for 2012-16. *See* P 4Supp 02944 - 03101. The Bi-

Op explained the protections required to preserve the bull trout populations:

> The conservation needs of bull trout are often generally expressed as the four
> "Cs": cold, clean, complex, and connected habitat. Cold stream temperatures,
> clean water quality that is relatively free of sediment and contaminants, complex
> channel characteristics (including abundant large wood and undercut banks), and
> large patches of such habitat that are well connected by unobstructed migratory
> pathways are all needed to promote conservation of bull trout at multiple scales
> ranging from the coterminous to local populations (a local population is a group
> of bull trout that spawn within a particular stream or portion of a stream system).
> The recovery planning process for bull trout has also identified the following
> conservation needs: 1) maintenance and restoration of multiple, interconnected
> populations in diverse habitats across the range of each interim recovery unit, 2)
> preservation of the diversity of life-history strategies, 3) maintenance of genetic
> and phenotypic diversity across the range of each interim recovery unit, and 4)
> establishment of a positive population trend. Recently, it has also been
> recognized that bull trout populations need to be protected from catastrophic fires
> across the range of each interim recovery unit.

P 4Supp 02993 (citations omitted). The Bi-Op concluded "that the proposed livestock

management is *not likely to adversely affect* bull trout and bull trout critical habitat in the Spring

Creek, North Fork, Ott, Bluebucket, Logan Valley[2], Star Glade, and Central Malheur

Allotments." P 4Supp 02949 (original emphasis). FWS concurred with the Forest Service's

other decisions on grazing management.

## LEGAL STANDARDS

When reviewing a final agency decision under the Administrative Procedures Act (APA),

the court determines whether the agency's decision was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Before overturning

---

[2] The Logan Valley allotment is not one of the seven allotments at issue.

an agency decision under the APA's deferential standard of review,

> the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted),

*abrogated in part on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). The court

presumes the agency acted properly and affirms the agency when "'a reasonable basis exists for

its decision.'" *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th

Cir. 2007) (quoting *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir.

2000) (citations omitted)). The plaintiff bears the burden of showing that an agency decision or

action was arbitrary and capricious. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

The parties have filed cross-motions for summary judgment under Federal Rule of Civil

Procedure 56. *See City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir.

1997) (summary judgment is "'an appropriate mechanism for deciding the legal question of

whether the agency could reasonably have found the facts as it did'") (quoting *Occidental Eng'g

Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985)). But when a court reviews an agency decision, the

APA's legal standards, not those of Rule 56, govern. In this context, "summary judgment" is

"simply a convenient label to trigger" judicial review. *Klamath Siskiyou Wildlands Ctr. v.

Gerritsma*, 962 F. Supp. 2d 1230, 1233 (D. Or. 2013), *aff'd*, 638 F. App'x 648 (9th Cir. 2016).

## DISCUSSION

### I. Justiciability

Defendants argue that Plaintiffs' claims are not justiciable because (1) Plaintiffs broadly

challenge the Forest Service's "pattern, practice, or policy" as to livestock grazing in the Malheur National Forest, rather than focusing on specific agency decisions; (2) Plaintiffs challenge unauthorized grazing, in effect seeking judicial review of the Forest Service's discretionary decisions on the enforcement of its grazing permits; (3) Plaintiffs challenge annual grazing authorizations that the Forest Service issued more than three seasons ago, or have replaced with new authorizations; and (4) Plaintiffs challenge the Forest Service's failure to issue or update Allotment Management Plans (AMPs) for the Forest, although Congress gives the Forest Service discretion in issuing AMPs.[3] I agree with Defendants that the AMP issue is not justiciable, and otherwise conclude that these issues are justiciable.

### A. Challenge to Agency Pattern, Practice, or Policy

The Forest Service argues that Plaintiffs are improperly seeking judicial review of the Forest Service's entire grazing program on the seven allotments, rather than specifically challenging individual Forest Service grazing decisions. The Forest Service contends that although Plaintiffs list more than 100 Forest Service final grazing decisions in an exhibit to their summary judgment motion, Plaintiffs do not challenge any of those decisions individually as arbitrary and capricious. *See* Pls.' Mot. Summ. J., Ex. 3 (table listing Forest Service decisions challenged by Plaintiffs).

The APA generally requires that the party seeking judicial review must identify the specific "agency action" that has injured the party. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871,

---

[3] I reject Plaintiffs' argument that Defendants should have raised justiciability arguments in a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Pls.' Reply 5. I agree with Defendants that such challenges may be raised at any time, including *sua sponte* by the court. *See, e.g., Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 673 (9th Cir. 2012).

882 (1990).  A plaintiff "'cannot seek *wholesale* improvement of this [administrative] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.'"  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (*SUWA*) (quoting *Lujan*, 497 U.S. at 891 (italics in original)).  This limit on judicial review is intended to "protect agencies from undue judicial interference with their lawful discretion," and "avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  *Id.* at 66.

Plaintiffs argue that their claims are justiciable because "[o]nly a claim untethered to any final agency action violates the rule that a plaintiff may not seek wholesale improvement of a program through litigation."  Pls.' Reply at 39.  I agree that this court may review an agency's "monitoring and management practices . . . when, and to the extent that, they affect the lawfulness of a particular final agency action."  *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002).  Although this is a close question, I conclude Plaintiffs' claims are justiciable even though a decision in their favor could implicate the validity of the entire grazing program on the seven allotments.  *See Lujan*, 497 U.S. at 890 n.2 (a person adversely affected by a specific final order or regulation may seek review under the APA even if judicial consideration of the challenged order or regulation would affect an entire program).

## B.  Plaintiffs' Claims Based on Unauthorized Grazing

Plaintiffs allege that bull trout habitat is being harmed by both authorized and unauthorized livestock grazing.[4]  Plaintiffs contend that to resolve their claims that the Forest

---

[4] The Forest Service recognizes three categories of unauthorized grazing:  "exceedances," grazing that occurs in the permitted time and place but in violation of the terms of the permit; excess use, grazing by livestock owned by a permittee but in greater numbers or in times or places not authorized by

Service acted arbitrarily and capriciously in administering the grazing program, it makes no

difference whether the grazing was authorized.

The Forest Service contends that its enforcement of the grazing program is discretionary

and therefore not justiciable. The APA provides that courts may not review an "agency action

[that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2) . The Forest Service cites

the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 172(a), which gives it

discretion to "cancel, suspend, or modify a grazing permit or lease, in whole or in part, pursuant to

the terms and conditions, thereof, or to cancel or suspend a grazing permit or lease for any

violation of a grazing regulation or of any term of such grazing permit or lease." Generally when

a statute is written in a permissive way, "an agency's decision not to act is considered

presumptively unreviewable because courts lack 'a focus for judicial review . . . to determine

whether the agency exceeded its statutory powers.'" *Bear Valley Mut. Water Co. v. Jewell*, 790

F.3d 977, 989 (9th Cir. 2015) (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). The

Supreme Court has explained that an agency action is not justiciable when there is no "meaningful

standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830.

Plaintiffs respond that they do not challenge the Forest Service's discretionary decisions

on enforcing grazing restrictions, but rather the Forest Service's decisions to continue to authorize

grazing despite being aware of multiple incidents of unauthorized grazing. The Forest Service

states that more than half of the alleged grazing violations cited by Plaintiffs are incidents of

unauthorized grazing. Fed. Defs.' Reply 13. I agree with Plaintiffs that unauthorized grazing and

---

the permit; and unauthorized use, grazing by livestock not owned by a permittee. Fed. Defs.' Reply 12-
13.

Page -12- FINDINGS AND RECOMMENDATION

its effects are relevant to their claims that the Forest Service acted arbitrarily and capriciously in its oversight of the grazing program.

### C. Plaintiffs' Claims Based on Expired or Superseded Grazing Authorizations

Defendants argue that Plaintiffs' claims not justiciable to the extent that they are based on annual grazing authorizations issued before 2013, or on superseded term grazing permits.[5] Plaintiffs respond that under the reasoning of *Oregon Natural Desert Association v. Tidwell*, 716 F. Supp. 2d 982, 994 (D. Or. 2010), their claims based on expired grazing authorizations are justiciable. In *Tidwell*, Judge Haggerty held that this court has jurisdiction to grant declaratory or injunctive relief based on expired annual grazing authorizations because "the grazing that takes place on each allotment during a season can have carryover [effects] that might last one or more seasons into the future. The fact that new annual grazing authorizations have been issued does not mean that damage from previous seasons cannot be remedied." *Id.*

Under *Tidwell*'s reasoning, the court determines whether it may provide effective relief for harm caused by past alleged violations. *Id.* Although determining the long-term effects of an expired grazing permit would undoubtedly be difficult, it would not be impossible for this court to fashion a remedy. To resolve the cross-motions at issue here, I assume this court may consider expired and superseded grazing authorizations, including those going back more than three years, because they may be relevant to current conditions.

### D. The Forest Service's Discretion to Issue Allotment Management Plans (AMPs)

Plaintiffs contend that the Forest Service has violated NFMA by failing to issue Allotment

---

[5] The Forest Service states that "out of respect and comity for the Court's ruling in [*Oregon Natural Desert Ass'n v. Tidwell*,716 F. Supp. 2d 982 (D. Or. 2010)]," it does not contend that annual grazing authorizations from 2013-15 are moot. Fed. Defs.' Reply 16.

Management Plans (AMPs) for the Flag Prairie, Ott, and Dollar Basin/Star Glade allotments, and

by failing to update AMPs for Spring Creek, North Fork, and Bluebucket allotments since 1970,

1979, and 1985, respectively. Pls.' Reply-Resp. 31, ECF No. 452. The Forest Service completed

an AMP for the seventh allotment at issue here, the Central Malheur Allotment, in 2015.

Plaintiffs argue that under *SUWA,* 542 U.S. at 62-63, this court has authority under the

APA to "compel agency action." Plaintiffs cite 36 C.F.R. § 222.2(b) as providing this court the

authority to compel the Forest Service to issue AMPs. Section 222.2(b) provides that "[e]ach

allotment will be analyzed and with careful and considered consultation and cooperation with the

affected permittees, landowners, and grazing advisory boards involved, as well as the State having

land within the area covered, and an allotment management plan developed."

The Forest Service responds that the applicable statute, 43 U.S.C. § 1752(d), gives it

discretion in deciding whether to prepare or update AMPs. Section 1752(d) provides:

> **(d) Allotment management plan requirements**
> *All permits and leases for domestic livestock grazing issued pursuant to this section may incorporate an allotment management plan developed by the Secretary concerned.* However, nothing in this subsection shall be construed to supersede any requirement for completion of court ordered environmental impact statements prior to development and incorporation of allotment management plans. *If the Secretary concerned elects to develop an allotment management plan for a given area,* he shall do so in careful and considered consultation, cooperation and coordination with the lessees, permittees, and landowners involved, the district grazing advisory boards established pursuant to section 1753 of this title, and any State or States having lands within the area to be covered by such allotment management plan. Allotment management plans shall be tailored to the specific range condition of the area to be covered by such plan, and shall be reviewed on a periodic basis to determine whether they have been effective in improving the range condition of the lands involved or whether such lands can be better managed under the provisions of subsection (e) of this section. *The Secretary concerned may revise or terminate such plans or develop new plans from time to time after such review and careful and considered consultation, cooperation and coordination with the parties involved.* As used in this subsection, the terms "court

ordered environmental impact statement" and "range condition" shall be defined as in the "Public Rangelands Improvement Act of 1978 [43 U.S.C.A. § 1901 et seq.]".

43 U.S.C. § 1752(d) (emphasis added).  The Forest Service also cites 43 U.S.C. § 1752(I), which gives federal agencies "sole discretion" in deciding whether to complete an environmental analysis of grazing allotments, permits, or leases:

> **(I) Priority and timing for completion of environmental analyses**
> The Secretary concerned, in the sole discretion of the Secretary concerned, shall determine the priority and timing for completing each required environmental analysis with respect to a grazing allotment, permit, or lease based on--
> (1) the environmental significance of the grazing allotment, permit, or lease; and
> (2) the available funding for the environmental analysis.

As to Plaintiffs' reliance on *SUWA*, the Forest Service notes that *SUWA* held that a court's authority under the APA to compel an agency to act is "carefully circumscribed to situations where the agency has ignored a specific . . . command," which is to be found in a federal statute or in an agency regulation with "the force of law."  *SUWA*, 542 U.S. at 65.  The agency must be "legally required" to act, "in the sense that the agency's legal obligation is so clearly set forth that it could traditionally have been enforced through a writ of mandamus."  *Id.*, 542 U.S. at 63; *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).  As to the regulation cited by Plaintiffs, 36 C.F.R. § 222.2(b), the Forest Service argues that Plaintiffs ignore the context of the regulation, which applies only when the Forest Service has decided in its discretion to develop an AMP.  Fed. Defs.' Reply 24, ECF No. 464.

In § 1752(d), Congress gave federal agencies almost unfettered discretion to determine whether, and when, to create or update AMPs.  I conclude that the Forest Service is not "legally required" by statute or rule to issue AMPs.  I conclude that Plaintiffs' claims are not justiciable to the extent Plaintiffs seek an order requiring the Forest Service to issue new or updated AMPs..

Page -15- FINDINGS AND RECOMMENDATION

## II. NFMA Claims

Plaintiffs claim that the Forest Service is violating NFMA by authorizing livestock grazing without properly monitoring riparian conditions.  Plaintiffs argue that the dwindling population of bull trout in the Malheur and North Fork Malheur watersheds is conclusive evidence that the Forest Service has failed to comply with the Forest Plan, thereby violating NFMA.  I conclude, however, that the Forest Service's decisions to authorize livestock grazing on the seven allotments at issue are not arbitrary and capricious.

### A. The Forest Service's Compliance With the Forest Plan

Plaintiffs contend that the Forest Service is failing to comply with the Forest Plan, including Forest Plan standards, the INFISH's Riparian Management Objectives, and Amendment 29.  The Forest Service's "interpretation and implementation of its own forest plan is entitled to substantial deference." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012) (citations omitted).

#### 1. Forest Plan Standards

Following NFMA regulations, the Forest Plan sets goals, desired future conditions, objectives, and standards.  *See* SPAR 1 at IV.  Here, Plaintiffs focus on the standards for Management Area 3A, Non-Anadromous Riparian Areas, which comprises about 19,000 acres of lakes, streams, and wetlands whose watersheds support resident non-anadromous fish, including bull trout.  SPAR 1 at IV-55 to IV-61.  Plaintiffs cite several of the Plan's standards under the headings Fish and Wildlife and Range, including (using the Plan's numbering):

> 5. Provide the necessary habitat to maintain or increase populations of management indicator species: bull trout, cutthroat trout, and rainbow/redband trout.

10. Improve the rate of recovery in riparian areas that are not in a condition to meet management objectives by eliminating or reducing the impacts of management activities that may slow riparian recovery.

11. Maintain or enhance water quality and/or fish habitat through instream or riparian improvements.  Implement instream activities outside of the spawning and egg incubation period.

19. Manage allotments to protect or enhance riparian-dependent resources.

21. Maintain sufficient streamside vegetation to maintain streambank stability and fish habitat capability.

SPAR 1, IV 56-58; Pls.' Mot. Summ. J. 17.  Plaintiffs refer to these standards as "narrative standards." *Id.*  The Forest Service characterizes the standards as "qualitative and essentially aspirational in form." Fed. Defs.' Am. Opening Summ. J. 23, ECF No. 482.

I agree with Defendants that these narrative planning standards are not judicially enforceable against individual Forest Service actions.  This court addressed a similar issue on compliance with a Forest Plan's standards, holding that "the forest-wide standards and guidelines plaintiffs cite are 'generally not amenable to suit under the APA because they do not constitute final agency actions.'" *Landwatch v. Connaughton*, No. 6:13-cv-2027-AA, 2014 WL 6893695, at *7 (D. Or. Dec. 5, 2014) (quoting *Ecology Ctr. v. Casteneda*, 574 F.3d 652, 658 (9th Cir. 2009) (citation omitted)), *aff'd sub nom. Central Oregon Landwatch v. Connaughton*, ___ F. App'x ___, 2017 WL 3616386 (9th Cir. Aug. 23, 2017) (unpublished).   Like the standards at issue here, the standards in *Landwatch* did not "'contain a 'clear indication of binding commitment,' such that the Court may compel the Forest Service's actions." *Landwatch*, at *7 (citing *SUWA*, 542 U.S. at 69).

### 2. Riparian Management Objectives and Amendment 29

Plaintiffs contend that the Forest Service has failed to comply with the INFISH Riparian

Management Objectives when it authorized livestock grazing on the seven allotments. Plaintiffs

cite RMO Standard GM-1, which provides:

> Modify grazing practices (e.g., accessibility of riparian areas to livestock,
> length of grazing season, stocking levels, timing of grazing, etc.) that retard or
> prevent attainment of Riparian Management Objectives or are likely to adversely
> affect inland native fish. Suspend grazing if adjusting practices is not effective in
> meeting Riparian Management Objectives.

2 SPAR 2478. Plaintiffs also refer to Amendment 29 to the Forest Plan, which provides that

stream bank stability should be at least 90%. The Forest Service has explained that Amendment

29 does not set "specific quantifiable standards for livestock grazing activities," but instead is

designed "provide the criteria against which attainment or progress toward attainment of the

riparian goals are measured." 4 SPAR 2844.

Defendants respond that the Forest Service may reasonably assess compliance with RMOs

at the watershed or landscape scale, rather than stream by stream. Defendants are correct. This

court has held that the Forest Service may assess compliance with RMOs at the watershed level.

*See Oregon Wild I*, 193 F. Supp. 3d at 1171 ("attainment of RMOs must be assessed on a

watershed level"); *League Of Wilderness Defenders/ Blue Mountains Biodiversity Project v.*

*Forest Serv.*, 883 F. Supp. 2d 979, 996-97 (D. Or. 2012) *(LOWD)* (holding that "it was not a clear

error of judgment for the Forest Service to evaluate PACFISH/INFISH standards primarily on a . .

. watershed scale") (footnote omitted), *rev'd in part on other grounds*, 585 F. App'x 613 (9th Cir.

2014).

Plaintiffs also argue that the Forest Service has failed to achieve RMOs, violating the

Page -18- FINDINGS AND RECOMMENDATION

Forest Plan, and therefore NFMA. This court has ruled, however, that RMOs are not rigid standards but rather targets "that will not be met instantaneously." *Oregon Wild I*, 193 F. Supp. 3d at 1171. "INFISH's approach is a flexible one; its objectives are targets that will not be met instantaneously but over time." *Oregon Wild II*, 239 F. Supp. 3d at 1267. In affirming this court's judgment in *Landwatch*, the Ninth Circuit explained, "The Forest Service views RMOs as benchmarks against which to measure progress towards ultimate goals. This interpretation 'is entitled to substantial deference.' It is also supported by the interim nature of the RMOs and their appropriate application to larger stream systems." *Central Oregon Landwatch*, at *1 (quoting *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 850 (9th Cir. 2013)). As this court has noted under similar circumstances, Plaintiffs' "narrow and rigid application of the RMOs departs from the strategy's [i.e., INFISH's] text." *Oregon Wild I*, 193 F. Supp. 3d at 1171. Failure to attain RMOs in an individual stream does not necessarily show a NFMA violation.

Plaintiffs cite two Biological Assessments (BAs) issued by the Forest Service in 2012, one addressing the bull trout habitat and populations on allotments in the upper Malheur River watershed, and the other addressing bull trout habitat and populations on allotments in the North Fork Malheur River watershed. *See* P 4Supp 02648 *et seq.* (BA covering the Bluebucket, Central Malheur, Dollar Basin, and Star Glade allotments, and other allotments not at issue here); P 4Supp 02812 *et seq.* (BA covering the Flag Prairie, Spring Creek, North Fork, and Ott allotments). These BAs include tables summarizing bull trout habitat conditions on the allotments. The BA for the Malheur River allotments found that most of the twenty-four habitat indicators for bull trout were "functioning at unacceptable risk." *See* P 4 Supp 02754-59. The BA noted that fewer than 50 adult fish were present in the Upper Malheur River watershed, and

that the subpopulation was "in rapid decline." P 4Supp 02754. The BA also noted "the [bull trout] subpopulation is isolated to a . . . small watershed not likely to support more than 2,000 fish." *Id.*

The BA for the North Fork Malheur River also found that bull trout habitat indicators were "functioning at risk." P 4Supp 02886-90. Like the Malheur River BA, the North Fork Malheur River BA found that the sub-population of bull trout was declining, with fewer than 50 adults. The North Fork BA concluded, however, that livestock grazing "May Affect, Not Likely to Adversely Affect" bull trout or bull trout habitat. P 4Supp 02932.

In its 2012 Bi-Op, FWS concurred in the Forest Service's management plans for livestock grazing. For each allotment, the Bi-Op, based on the Forest Service's 2012 BAs, prescribed conditions for grazing. P 4Supp 02955-60. The conditions vary by allotment, and include requiring permittees to use perimeter and interior fencing; prohibiting grazing after August 15 on pastures containing spawning and rearing habitat; allowing grazing down to a minimum stubble height of four to six inches; and prescribing a "combination of range readiness inspections, mid-season monitoring, and . . . compliance checks . . . to ensure compliance with endpoint standards." *See, e.g.*, P 4Supp 02960 (Central Malheur allotment). For each allotment where livestock grazing is permitted, the Bi-Op states that "[a]ny habitat effects associated with this allotment are not expected to have lasting impacts that will persist over time." *See id.* The Bi-Op notes that "[t]he proposed management is likely to produce isolated occurrences of increased sediment and turbidity and minor bank alteration where livestock enter or cross streams. These effects are expected to be short duration and very small in scale; therefore, are not expected to significantly disrupt normal behavioral patters of bull trout." *Id.*

Page -20- FINDINGS AND RECOMMENDATION

Intervenor-Defendants note that each grazing permit at issue here incorporates INFISH standards for stubble height, bank alteration, and woody browse indicators, and that these standards are enforceable terms of each permit. The permits also incorporate "the indicators required to achieve the Forest Plan's . . . riparian goals, and other standards required by the Biological Assessments and Biological Opinions." Intervenor-Defs.' Corrected Cross-Mot. for Summ. J. 23, ECF No. 459. Each year, the Forest Service monitors grazing allotments for compliance with the various indicators such as 45% use or stubble height of 4-6 inches along the "greenline." At the end of the year, the Forest Service issues reports to ensure that grazing meets the required indicators, meets with permittees to assess results, and modifies or adjusts permit requirements to maintain standards.

The crucial fact here is that although the 2012 BAs indicated that the bull trout and bull trout habitats on the seven allotments were in jeopardy, the BAs did not find that livestock grazing is causing the decline in bull trout population or habitat. Instead, the BAs generally found that grazing as currently managed by the Forest Service had little or no harmful effect on the bull trout habitat and population, and FWS concurred in that determination. I conclude that Plaintiffs have not shown that the Forest Service's decisions to authorize livestock grazing has caused the decline of the bull trout population or its habitat in the allotments here. As Defendants note, many factors have contributed to that decline. The 2012 Bi-Op stated that "past and ongoing human-induced activities have increased stream temperatures, increased sediment delivery, and resulted in the loss of large pools. These activities include the creation and management of Warm Springs and Agency dams, forest management practices, irrigation withdrawals, livestock grazing, past bull trout harvest, and introduction of non-native species (brook trout)." P 4Supp 03006.

In similar contexts, this court has held that environmental plaintiffs had failed to show livestock grazing had caused a failure to meet INFISH RMOs.  In *Oregon Wild I*, the plaintiffs contended that livestock grazing authorized by annual operating instructions had violated NFMA by contributing to violations of the INFISH RMO for stream water temperature.  193 F. Supp. 2d at 1171.  This court held that the Forest Service had reasonably evaluated the relevant information, and concluded that the plaintiffs had failed "to demonstrate that the permitted grazing [was] responsible for the noted exceedances." *Id.*  In *Oregon Wild II*, this court concluded the plaintiffs did not show that grazing on the challenged allotments "is the culprit for any failure to attain INFISH RMOs."  239 F. Supp. 3d at 1266.  As Judge Simon has noted, NFMA "requires the Forest Service to manage the National Forest System lands not only to protect wildlife and wilderness, but also to enable sustainable use of the forests' resources." *LOWD*, 883 F. Supp. 3d at 991 (noting that uses such as logging and grazing "will necessarily have *some* impact on fish habitat").  I conclude that the Forest Service has not acted arbitrarily and capriciously in authorizing grazing on the seven allotments in the Malheur National Forest.

## B.  The Forest Service's Collection and Analysis of Data

Plaintiffs contend that the Forest Service has failed to collect relevant data on riparian conditions, and has failed to properly analyze the data it did collect, resulting in violations of NFMA.  Plaintiffs argue that while the Forest Service has discretion in complying with the Forest Plan, it does not have discretion to make decisions based on insufficient data.  Pls.' Reply-Resp. 13 (citing *Tidwell*, 716 F. Supp. 2d at 1008).  I conclude, however, that the Forest Service has shown that it has acted reasonably in its oversight of livestock grazing, using scientifically based monitoring and analysis.

The Forest Service uses information gathered through the PACFISH/INFISH Biological Opinion Effectiveness Monitoring Program, or PIBO. *See* First Archer Decl., Ex. A, at 5, ECF No. 438-1.[6] PIBO, which began collecting data in 2001 in the interior Columbia River basin and the Upper Missouri River basin, compares "the status of stream habitat conditions at sites in 'managed watersheds' (watersheds exposed to disturbance from various management actions) to habitat conditions at sites within 'reference,' or relatively pristine, watersheds, which are used as a benchmark of expected condition." *Id.*

The Forest Service's expert on PIBO, Eric Archer, began working for the Forest Service on the pilot PIBO project in 1999, and since 2006, Archer has been PIBO's project leader. First Archer Decl. ¶ 3.[7] PIBO evaluates eight different habitat "metrics" to assess trends in riparian resources, through rotated monitoring at selected representative sites. *Id.* ¶¶ 8-12. Archer states, "The PIBO monitoring program has a very carefully crafted process for [randomly] selecting sampling sites from which it gathers its monitoring data." Second Archer Decl. ¶ 4. Although only one sampling site is on the two rivers in question, "sample locations have been identified primarily upstream of the Wild and Scenic designated sections of the [Malheur and North Fork Malheur Rivers]." *Id.* The upstream monitoring sites are useful because stream habitats are naturally affected by land management decisions and other conditions upstream, such as the prevalence of woody debris and sediment. *Id.*

---

[6] In addition to using PIBO to monitor fish habitat, the Forest Service also uses Proper Functioning Condition (PFC) Assessments; Multiple Indicator Monitoring (MIM); Spawning Surveys; and uplands monitoring. *See* P 4Supp 02712 (describing different monitoring methods).

[7] I find that Archer's declarations, and the other declarations submitted by the Forest Service, are admissible to help this court understand the complex technical evidence. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

Page -23- FINDINGS AND RECOMMENDATION

As noted above, "the present status of these streams is the result of many different management actions in addition to livestock grazing, such as roads and timber harvest, as well as activities that have occurred without any human intervention or causality, and . . . that the status reflects the effects of such activities that have occurred over many decades." Second Archer Decl. ¶ 10. Archer states that although the Upper Malheur subbasin has not fully recovered from past management actions, "the PIBO assessment of quantitative data obtained from repeated stream surveys, as well as qualitative data such as repeated photo points . . . , clearly indicate that the trend in stream habitat conditions is improving through time, and is therefore meeting the goals underlying INFISH management direction." *Id.* Archer states that he bases his conclusion "on carefully and systematically gathered and analyzed data the very purpose of which is to address that very issue." Second Archer Decl. ¶ 1, ECF No. 467.[8]

In challenging the validity of the PIBO monitoring program, Plaintiffs argue that the Forest Service asks this court to defer to "a void" of data. *See Tidwell*, 716 F. Supp. 2d at 1008 ("This court 'cannot defer to a void.'") (quoting *Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1142 (9th Cir. 2008), *amended*, 625 F.3d 1092, 1121 (9th Cir. 2010)). Plaintiffs contend that the information the Forest Service gathered through the monitoring of stream conditions is so useless as to be equivalent to no data. Unlike *Tidwell*, however, here Plaintiffs have not shown that the Forest Service "failed to conduct adequate monitoring." *Id.* The record here establishes that the Forest Service reasonably monitored riparian conditions and analyzed the data collected.

---

[8] In 2015, Archer and a co-author issued a habitat condition report on the Malheur River Basin, using PIBO monitoring data, which concluded that RMOs were trending positive other than one downward trend of 0.05% for pool percentage. P 4Supp 11628.

Page -24- FINDINGS AND RECOMMENDATION

Plaintiffs submit expert declarations disagreeing with Archer's conclusions. *See, e.g.*, Fourth Beschta Decl.[9] Plaintiffs argue that the PIBO assessment information is not useful in evaluating the effects of livestock grazing because the PIBO monitoring system "has no 'reference' sites (i.e., sites where livestock grazing has been absent during the last 30 years) along the [Malheur River or North Fork Malheur River] and relatively few reference sites for all of Oregon." Fourth Beschta Decl. ¶ 3. Plaintiffs also argue that riparian areas where livestock are excluded (called "exclosures") show that vegetation and stream banks recover rapidly in the absence of livestock grazing. Plaintiffs' expert Robert Beschta states that the exclosures "illustrate the potential diversity and productivity of riparian plant communities that can occur once livestock effects are removed, and they demonstrate that well-vegetated and stable streambanks dominate riparian systems in the absence of livestock grazing." Fourth Beschta Decl. ¶ 3. Beschta states that his observations on visits over the years to the Malheur River and North Fork Malheur River "confirmed that both streambank alteration and streambank stability have been significantly and adversely affected by long-term livestock grazing." Fourth Beschta Decl. ¶ 11, ECF No. 453. Beschta states that "annual grazing and trampling" by livestock has "continually short-circuited" the "normal diversity and productivity of riparian vegetation" along the Malheur and North Fork Malheur Rivers. Fourth Beschta Decl. ¶ 13.

The Forest Service's experts criticize Beschta's declarations. Tony Svejcar, a retired rangeland scientist, states that Beschta and Plaintiffs' expert J. Boone Kaufmann "used pictures and relatively subjective opinions in an effort to make the case that livestock grazing is not

---

[9] For purposes of resolving the parties' cross-motions, I accept the declarations submitted by Plaintiffs' experts.

compatible with improving riparian and stream conditions along the Malheur River (MR) and North Fork of the Malheur River (NFMR)." Svejcar Decl. 2-3, ECF No. 440. Svejcar states that Plaintiffs' experts submitted photographs of stream banks without providing context such as the season in which the photo was taken. For example, one photograph depicts an apparently degraded stream bank without explaining the extent of the damage or how the site was selected. Similarly, for the photographs submitted to show stream bank recovery, "there is no way to know the composition or structure of these areas before they were excluded [from livestock grazing]." *Id.* at 3. I cannot find on this record that the Forest Service unreasonably relied on the PIBO monitoring data and analysis.

Plaintiffs challenge the Forest Service's use of bank alteration as an indicator to determine the effect of livestock grazing and channel shape. The Forest Service uses 10-20% bank alteration as an "annual or short-term indicator used to evaluate the potential effects of livestock grazing in riparian areas, primarily evaluating potential effects to long-term streambank stability and channel shape." P 4Supp 02863. Plaintiffs argue that using bank alteration as an indicator violates Amendment 29 to the Forest Plan, which requires at least 90% stream bank stability. Plaintiffs also challenge the Forest Service's use of vegetation and woody browse as indicators of RMO attainment.

I conclude that the Forest Service acted reasonably in the collection and analysis of data on riparian habitat conditions. "The Ninth Circuit has cautioned that courts must be particularly deferential when the Forest Service is considering highly technical issues within its area of special expertise." *LOWD*, 883 F. Supp. 2d at 985 (citing *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc), *overruled in part on other grounds by Winter v. Natural Resources*

Page -26- FINDINGS AND RECOMMENDATION

*Defense Council, Inc.*, 555 U.S. 7 (2008)); *see also League Of Wilderness Defenders/ Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (court's deference when reviewing agency decision "is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise"). Because of this deference, a court should not instruct an agency on scientific issues, or choose between scientific studies, or order "the agency to explain every possible scientific uncertainty." *Lands Council*, 537 F.3d at 988. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 1000 (internal citations and quotation marks omitted).

I defer to the Forest Service's explanation for using bank alteration as an indicator of bank stability, which was based on scientific papers on the subject. *Id.* In *Tidwell*, this court concluded that bank alteration was a reasonable habitat proxy for the "take" of steelhead, noting that "bank alteration plays a role in streambank stability (an important feature of healthy habitat)," and finding that the bank alteration standard was proportional to habitat impacts of grazing and was a standardized and repeatable measurement method. 716 F. Supp. 2d at 998. I also defer to the Forest Service's use of other indicators to show RMO trends. The Forest Service has shown that it reasonably relied on the scientifically based PIBO monitoring system, and on the use of habitat indicators as proxies in evaluating attainment of RMOs. I conclude that the Forest Service's management of livestock grazing on the seven allotments at issue is not arbitrary and capricious, and complies with NFMA.

**III. Claim Under the Wild and Scenic Rivers Act (WSRA)**

Page -27- FINDINGS AND RECOMMENDATION

Plaintiffs claim that the Forest Service violates the WSRA by failing to meet INFISH and

Forest Plan standards for grazing, and by failing to comply with the WSRA's "protect and

enhance" requirement. The WSRA requires that federal agencies "protect and enhance" Wild and

Scenic values, requiring that they give "primary emphasis . . . to . . . esthetic, scenic, historic, and

scientific features." 16 U.S.C. § 1281(a). Plaintiffs claim that the Forest Service is applying an

"improperly reactive grazing standard, combined with its annual authorization of grazing that

prevents attainment of RMOs and other Forest Plan standards." Pls.' Reply 33.

Defendants do not seriously dispute that livestock grazing can interfere with Wild and

Scenic values. *See Oregon Wild I*, 193 F. Supp. 3d at 1172. But the WSRA provides that

agencies should manage rivers "in such manner as to protect and enhance the values which caused

it to be included in said system without, insofar as is consistent therewith, limiting other uses that

do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. §

1281(a). The WSRA therefore "contemplates the continuation of uses that interfere with the

public use and enjoyment of a river's ORV [outstandingly remarkable values]." *Oregon Wild I*,

193 F. Supp. 3d at 1172.

Here, the Forest Service reasonably determined that livestock grazing did not

"substantially interfere with public use and enjoyment" of esthetic, scenic, historic, and scientific

values. Intervenor-Defendants state that the Forest Service has generally excluded livestock from

river corridors, and "[f]or most allotments, the river corridor is separated by fence and steep

terrain." Intervenor-Defs.' Reply 43. I agree with Defendants that Plaintiffs have not shown that

unauthorized grazing has violated the WSRA. I conclude that the Forest Service is not violating

the WSRA by authorizing livestock grazing on the allotments at issue.

Page -28- FINDINGS AND RECOMMENDATION

## CONCLUSION

For the reasons provided above, Plaintiffs' Motion for Summary Judgment, ECF No. 416, should be DENIED; Defendants' Amended Cross-Motion for Summary Judgment, ECF No. 482, should be GRANTED; and Intervenor-Defendants' Corrected Cross-Motion for Summary Judgment, ECF No. 459, should be GRANTED.  Intervenor-Defendants' Corrected Motion to Strike Plaintiffs' Extra-Record Filings, ECF No. 458, is DENIED as moot.  Judgment should be prepared dismissing this action with prejudice.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 3rd day of October, 2017.

Honorable Paul Papak
United States Magistrate Judge