**BILLY J. WILLIAMS (OSB #901366)**
United States Attorney
District of Oregon
**STEPHEN J. ODELL (OSB #903530)**
Assistant United States Attorney
steve.odell@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, OR 97204-2902
Telephone:  (503) 727-1024
Telefax:  (503) 727-1117
        Of Attorneys for Federal Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| OREGON NATURAL DESERT ASSOCIATION and CENTER FOR BIOLOGICAL DIVERSITY, | Case no. 3:03-cv-00213-PK |
| Plaintiffs, | FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO THE FINDINGS & RECOMMENDATION ON RESOLUTION OF CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| vs. | |
| UNITED STATES FOREST SERVICE, and STEVE BEVERLIN, Malheur National Forest Supervisor, | |
| Defendants, | |
| and | |
| JEFF HUSSEY, et al. | |
| Defendant-Intervenors. | |

**INTRODUCTION**

As they noted in their narrowly tailored objections to the Findings and Recommendation ("F&R") Magistrate Judge Papak issued on the cross-motions for summary judgment in the above-captioned action (Dkt. #485), the F&R generally reflects a carefully crafted and sound analysis and treatment of each of the principal issues necessary to resolution of Plaintiffs' claims, on the basis of which Magistrate Judge Papak issued his recommendation that the Court rule in favor of Federal Defendants on the merits of every single one of such claims.  Plaintiffs, on the other hand, filed a veritable indiscriminate blunderbuss of objections to the F&R that spares virtually not a single finding or recommendation adverse to their position and reads, in all fairness, almost entirely as a simple rehash of the briefs they originally filed in support of their motion for summary judgment.  Their arguments fare no better the second time 'round the block.

As they explain in more detail below, Plaintiffs' arguments continue to suffer from several overarching and fatal flaws and therefore do nothing to undermine Magistrate Judge Papak's findings or ultimate recommendation on the merits of Plaintiffs' claims.  These flaws can generally be classified as follows:  (1) Plaintiffs regularly confuse and/or conflate issues of geographic scale appropriate to particular purposes, the precise understanding and application of which are essential to the correct judicial determinations Magistrate Judge Papak made based on the Forest Service's replete data and findings in the record; (2) Plaintiffs regularly misconstrue and misapply critical terms and nomenclature in the applicable management direction on which their claims are based, including, specifically, in the distinctions between "objectives" and "standards," and in the different types and purposes of monitoring that the Forest Service conducts, among other areas; (3) Plaintiffs regularly seek to improperly substitute and fail to distinguish between static, isolated, discrete and often "cherry-picked" data points at specific

locations at a given point in time, and trends in riparian habitat conditions over time, the latter of which are the key, as Magistrate Judge Papak correctly understood and this Court has previously explicitly ruled; (4) Plaintiffs regularly engage in the logical error of failing to apprehend that, because quite literally the only reliable data and findings in the record going to the critical issue of the current trend of riparian habitat conditions in the applicable subwatershed reveals a generally positive trajectory, Magistrate Judge Papak's finding that the livestock grazing the Forest Service authorized that Plaintiffs challenge is not preventing or retarding upward progress in such conditions is unassailable; and (5) finally, Plaintiffs regularly fail to recognize that their hyper-formalistic contentions going to process, to which it seems apparent they felt the need to turn in light of the strong upward substantive trend data that cannot be airbrushed out of the record regardless of the number of individual photos of "hot spots" or data points they may cite, are not supported by any requirement in statute or regulation and also simply underscores the reality that their claims are effectively of the non-justiciable "pattern, practice, or policy" variety.

The Court should adopt the F&R in its entirety insofar as it addresses and provides recommended rulings on the merits of Plaintiffs' claims.[1]

## FACTUAL BACKGROUND

### A.    Forest Service's Development of Management Direction & Guidance

Pursuant to NFMA, the Malheur NF adopted a Land and Resource Management Plan for the Forest ("Malheur LRMP") in May 1990.  PAR 110-50.  The LRMP follows the direction in the NFMA planning regulations by distinguishing among goals, objectives, desired future

---

[1] In order to stay within the page limitations for these objections, Federal Defendants would refer the Court to its previous recitation of the applicable Statutory and Regulatory Framework as set forth in its amended opening summary judgment brief (Dkt. #482).  It further respectfrully incorporates by reference all of its previous summary judgment briefing on the merits of Plaintiffs' claims for purposes of responding to Plaintiffs' objections.

conditions, and actual management direction that takes the form of Standards & Guidelines or "S&Gs").  SPAR 1 at IV-1 – IV-4 (Forest Goals); *id.* at IV-4 – IV-10 ("Desired Future Condition"); *id.* at IV-10 – IV-24 (Objectives); *id.* at IV-24 – IV-45 (189 Forestwide standards); *id.* at IV-46 – IV-139 (setting forth more specific Goals and Standards for each of 22 "Management Areas" ("MAs") on the Forest).  Of the 22 Management Areas, two are of particular relevance to Plaintiffs' claims:  MA 3A, Non-Anadromous Riparian Areas, which comprise approximately 19,000 acres, and MA 22, Wild and Scenic Rivers, which encompass a little more than 10,000 acres.  See *id.* at IV-55 – IV-61 (Goals and Standards for MA 3A) & IV-134 – IV-139 (Goals and Standards for MA 22).  For MA 3A, the Malheur LRMP as originally adopted set forth 51 standards in addition to those which apply Forestwide, ten of which fall under the category of Fish and Wildlife and eight under the category of Range.  *Id.* at IV-55 – IV-61.  The original direction for MA 22 in the Malheur LRMP as initially adopted included more than 40 Standards across a wide range of resources and values to provide direction on how the Forest is to manage areas falling within its bounds.  *Id.* at IV-134 – IV-139.

Many of these standards are qualitative and essentially aspirational in form; in particular, Plaintiffs set forth snippets of or paraphrase eight that fall within this category that they assert the Forest has violated in each of the various agency actions in which it has engaged to authorize livestock grazing that Plaintiffs challenge in this case.  *See* Pls.' Op'g SJ Brf. at 17 (drawing excerpts from F&W Stds 5, 8, 10, & 11, and Range Stds 19, 20, & 21.)

The following year, in 1994, the Forest incorporated Amendment #29 into the Malheur LRMP that modified the Forest's management direction for riparian areas, designated as Management Areas 3A (for water bodies without non-anadromous fish) and 3B (for water bodies with anadromous fish).  PAR 870-884.  The amendment modified the Fish and Wildlife resource

elements for both types of riparian areas to include more specific, quantitative "Numeric Values," which the Forest has construed as "desired future conditions," that such areas were to be managed to achieve over time. PAR 870 & 875; 4SPAR 2843. Of importance in the present context, the Forest has explained that Amendment 29 does "not set specific quantifiable standards for livestock grazing activities," but rather were designed "to provide the criteria against which attainment or progress toward attainment of the riparian goals are measured." 4SPAR 2844. In adopting Amendment #29, the Forest Supervisor indicated that its purpose was not to change the "desired future condition" for the Forest's riparian areas, but rather to define it more specifically, and that he did not expect it would result in any significant change in outputs on the Forest. PAR 873.

Then, the year after the Malheur NF adopted Amendment #29 for its LRMP, the Forest Service adopted a much broader-scale "Inland Native Fish Strategy" ("INFS" or "INFISH") as direction for managing fish-producing watersheds to protect habitat and populations of resident native fish outside of anadromous fish habitat that served to amend management direction for National Forest System lands in Eastern Oregon and Washington, Idaho, western Montana, and portions of Nevada, including the Malheur NF. PAR909 & 2SPAR 2452; *see* Blue Mtns. Biodiversity Proj. v. Pence, 22 F. Supp. 2d 1136, 1139 (D. Or. 1998)(describing INFISH as a "strategy for the conservation of riparian environments; it addresses the conservation of non-anadromous fish producing watersheds"). Originally intended to be only an interim strategy in effect until a series of longer-term and more geographically specific conservation strategies were developed, the fundamental purpose behind the agency's decision to adopt INFISH was to maintain options for inland native fish by reducing the risk to their populations and potential negative effects to their aquatic habitat pending adoption of such other strategies. 2SPAR 2454.

In accordance with the different elements of an LRMP discussed above, INFISH likewise clearly distinguishes among goals, objectives, and Standards & Guidelines ("S&Gs") concerning direction for management of activities affecting riparian habitat. PAR 357. At the highest scale of abstraction, the strategy lays out a series of Riparian Goals that establish a common set of characteristics of healthy, functioning watersheds, riparian areas, and associated fish habitats. 2SPAR 2471-72.  One level removed from the Riparian Goals are Riparian Management Objectives ("RMOs"), which establish measurable habitat parameters that together define good fish habitat and are designed to "serve as indicators against which attainment or progress toward attainment of the goals can be measured."  2SPAR 2472-73. The strategy delineates six "landscape-scale" RMOs for habitat features including pool frequency, water temperature, large woody debris, bank stability, lower bank angle, and width/depth ratio. Tables A-1 & A-2, 2SPAR 2474.  In setting forth the RMOs, the agencies were careful to point out that "[a]ll of the described features may not occur in a specific segment of stream within a watershed, but all generally should occur at the watershed scale for stream systems of moderate to large size (3rd to 6th order streams)."  2SPAR 2472.

INFISH also includes a series of S&Gs that prescribe direction for the Forest Service's management of various activities such as timber harvest, road-building, livestock grazing, and recreation within Riparian Habitat Conservation Areas within applicable watersheds on National Forests.  2SPAR 2476-82.  In particular, INFISH contains four grazing S&Gs, identified as GM-1 through GM-4.  2SPAR 2478-79.  Most relevant to the present case is GM-1, which provides the following direction to the agencies:

> Modify grazing practices (e.g., accessibility of riparian areas to livestock, length
> of grazing season, stocking levels, timing of grazing, etc.) that retard or prevent
> attainment of Riparian Management Objectives or are likely to adversely affect
> inland native fish. Suspend grazing if adjusting practices is not effective in

meeting Riparian Management Objectives.

2SPAR 2478.

Shortly after its adoption, the Forest Service prepared an Implementation and Monitoring

Plan for INFISH designed to provide administrative direction on how to interpret and implement

the strategy, including guidance on interpretation of the element of GM-1 that directs the agency

to modify grazing practices that retard attainment of RMOs.  2SPAR 2493. In particular, the

guidance memorandum states the following regarding that interpretation:

> What is meant by Retard Attainment of RMOs as related to grazing Standards and
> Guidelines? The RMOs established by INFS describe habitat features which
> exhibit change relatively slowly, thereby, making it difficult, if not impossible, to
> detect change with[in] the 18-month lifespan of the INFS. Since the condition of
> the riparian vegetative community directly affects these RMOs and changes in
> riparian vegetation are generally detectable within short time periods, the
> recovery of the vegetation component of the riparian system will be used to
> predict whether grazing will ultimately degrade or prevent the attainment of the
> RMOs.

2SPAR 2501 (emphasis supplied). The plan also emphasizes that INFISH "was designed to

provide the line officer with a great deal of flexibility in implementation of the strategy." *Id.*

The adoption of INFISH occurred shortly after the Forest Service and Bureau of Land

Management jointly adopted a similar interim strategy for anadromous fish-producing

watersheds that is known colloquially as "PACFISH."  Decision Notice/Decision Record re:

Interim Strategies for Managing Anadromous Fish-producing Watersheds on Federal Lands in

Eastern Oregon and Washington, Idaho, and portions of California. 2SPAR 2378-2415. The

similarity between the two strategies is particularly acute with respect to the issues at stake in the

present case, as they both contain GM-1 standards that are nearly verbatim recitations of each

other and the RMOs in both are very similar as well. Compare INFISH GM-1 (SPAR 2478)

with PACFISH GM-1 (SSPAR 2403) & INFISH RMOs (SSPAR 2472-74) with PACFISH

RMOs (SSPAR 2395-97). In light of these similarities, the MNF has utilized its discretion and looked to certain PACFISH guidance on GM-1 in construing and applying GM-1 under INFISH to shed further light on INFISH's implementation direction, at least insofar as the PACFISH direction is not inconsistent therewith. See SSPAR 0325-26. In this regard, as with INFISH, direction was issued shortly after PACFISH was adopted to provide guidance to field units in the interpretation and implementation of the strategy. SSPAR 2422-44. Included in this PACFISH direction are several "enclosures" that address certain issues in more detail; one such enclosure, designated "Enclosure B," was specifically designed to address application of the PACFISH EA glossary term, "retard attainment of RMOs" in the context of the agencies' administration of their range programs. SSPAR 2422; see SSPAR 2433-38 & 2445-51 (revision of enclosure dated Aug. 14, 1995). Enclosure B, specifically entitled "Recommended Livestock Grazing Guidelines," lays out a number of "Key Assumptions" that undergird its guidance. SSPAR 2446-47. The first key assumption is as follows: "Influences of livestock grazing must result in riparian restoration at a minimum of 'near natural' rates. We recognize that some environmental effects are inherent with the presence of livestock. However, we believe that 'near natural' rates of recovery can be provided if we limit environmental effects to those that do not carry through to the next year, thereby avoiding cumulative, negative effects." SSPAR 2446 (emphasis in original).

The Forest has recognized that the "Numeric Values" or "Desired Future Condition" parameters under Amendment #29 to its LRMP are not in all respects the same as the default RMOs that were established upon adoption of INFISH. 4SPAR 2844. INFISH provides that Forests should manage according to the more conservative parameters applicable to a given habitat component. SPAR 3; 4SPAR 2844. Toward that end, the Forest has prepared a side-by-

side comparison of these parameters and, where they differ, has identified which one is more conservative, and therefore, is the one against which it should measure progress. 4SPAR 2845 (Table 21). With particular respect to bank stability, for example, Amendment #29 contains a Numeric Value only for forested ecosystems, which is 90 percent and provides in subwatersheds where stability exceeds that figure, management should not bring about a decrease, and does not provide a value for non-forested ecosystems. PAR 878. The INFISH RMO for bank stability, on the other hand, addresses only non-forested systems, and is greater than 80 percent. SPAR 26. Thus, there is no conflict between the two; as the Forest has straightforwardly recognized in construing its planning direction, the Amendment #29 Numeric Value applies for forested ecosystems and the INFISH RMO applies for non-forested systems. 4SPAR 2845 (Table 21); *see also* 3SPAR 154.

INFISH also instructs the agencies to conduct two kinds of monitoring, Implementation Monitoring and Effectiveness Monitoring, although it does not offer much in the way of specific prescriptions as to how such monitoring is to be conducted. 2SPAR 2485. In the main, the strategy provides the following with respect to the purposes of these distinct forms of monitoring: The primary focus is to verify that the standards and guidelines were applied during the project implementation. Monitoring to assess whether those protective measures [i.e., S&Gs] are effective to attain Riparian Goals and Management Objectives would be a lower priority given the short time frame for this interim direction. Complex ecological processes and long time frames are inherent in the RMOs, and it is unrealistic to expect that the planned monitoring would generate conclusive results within 18 months. Nevertheless, it is critical to begin

monitoring.  Forests are urged to utilize current Forest Plan monitoring efforts, and Section 7

Monitoring results from PACFISH areas where on the same Forest to establish a baseline for

determining the effectiveness of these [S&Gs].  *Id.*

The value of monitoring was reaffirmed and fleshed out in the Biological Opinion that

FWS issued on the likely effects of INFISH on Bull Trout.  PAR 2076-2299.  Shortly after

issuance of this Biological Opinion, the Regional Executives of the affected regions of the Forest

Service, Bureau of Land Management, FWS, and National Marine Fisheries Service, including

the Regional Forester for the Pacific Northwest Region in which the Malheur NF is located,

adopted a charter for implementing the responsibilities to which the Forest Service had

committed itself in connection with the consultation leading to the PACFISH/INFISH Biological

Opinion ("PIBO").  PAR2324-55.  Toward this end, the charter established a series of teams,

including one to focus on developing a plan for the carrying out of monitoring to evaluate,

among other things, the implementation and effectiveness of INFISH over time.  PAR 2331.

Building on the work of a three-year pilot project that got underway in 1998 and carried

out effectiveness monitoring on streams and riparian areas within the Upper Columbia Basin,

including at sites on the Malheur National Forest, PAR4883-4974, the interagency PIBO

Effectiveness Monitoring Team developed and issued an effectiveness monitoring plan in Dec.

2002.  PAR5804-38.  The abstract of the plan states that its intent is "to evaluate the effect of

land management activities on aquatic and riparian communities at multiple scales and will

assess whether management direction, implemented through PACFISH/INFISH and the

Biological Opinions [issued on those aquatic conservation strategies] (PIBO) is effective in

maintaining or improving aquatic and riparian conditions at both the landscape and watershed

scales on federal lands."  PAR5807.  The abstract goes on to explain that its objectives include,

**Page 9 -** FED. DEFS.' RESP. TO PLS.' OBJS. TO FINDINGS & RECOMMENDATION
  *ONDA v. Forest Serv.,* Case no. 03-cv-213-PK

among other things, "determining whether a suite of biological and physical attributes, processes, and functions of upland, riparian, and aquatic systems are being degraded, maintained, or restored across the PIBO landscape [and] determining the direction and rate of change in riparian and aquatic habitats over time as a function of management practices." It further emphasizes that the time frame for making such determinations is necessarily long-term, as "many of the changes [in riparian function] as a result of changes in management will most likely not occur during a short time period (1 to 5 years)" and that "[l]ong-term monitoring will be the only way that we will be able to detect whether changes in past management are indeed influencing watershed conditions." *Id.* PIBO Effectiveness Monitoring has continued on a regular basis ever since, providing systematic, objective, quantitative data pursuant to the plan the interagency team has developed and continues to improve over time as it gains more experience with the methods and protocols being employed to gather this valuable data. *See, e.g.,* 3SPAR 2815-3015; 3SPAR 4409-4537; 3SPAR 5020-50; 3SPAR 5882-93.

As FWS stated in its most recent Biological Opinion analyzing the effects of the Forest's authorized livestock grazing on Bull Trout, "Effectiveness (riparian objective) monitoring is designed to address the question of whether or not management practices currently applied to the area are achieving the desired results. These procedures are designed to assess the current condition and measure changes in streambanks, channels, and streamside vegetation over time (e.g., trend). They help determine if local livestock grazing management strategies and other land management actions are making progress toward achieving the long-term goals and objectives for streamside riparian vegetation and aquatic resources." 4SPAR 2967. In other words, the key objective and valuable characteristic of effectiveness monitoring that is unique from other kinds of more snapshot-oriented monitoring of conditions or ocular observations

during field visits is to provide data by which one can systematically and robustly evaluate the trend, and not just the present condition, of a reach or watershed.

In addition, the Forest has engaged in extensive implementation monitoring on each of the allotments at issue, and has prepared End-of-Year ("EOY") Reports at the conclusion of each grazing season that sets forth the results of that season's implementation monitoring.  *See, e.g.,* 3SPAR 5064-5144 (2006 Rpt.); 3SPAR 5989-6032 (2007 Rpt.); 3SPAR 6306-44 (2008 Rpt.); 3SPAR 7100-34 (2009 Rpt.); 4SPAR 3450-3521 (final, revised 2011 Rpt.); 4SPAR 5900-6129 (2012 Rpt.); 4SPAR 7070-7309 (2013 Rpt.); 4SPAR 6577-6807 (2014 Rpt.); 4SPAR 11638-11872 (2015 Rpt.).  Moreover, per Terms and Conditions in the two five-year BiOps that have covered the 2007-16 grazing seasons, the Forest provides its EOY Reports to FWS upon their completion.  *See, e.g.,* 3SPAR 6033; 3SPAR 6348; 3SPAR 7419-53; 4SPAR 11636.  This step allows for FWS, the consulting agency on Bull Trout under the ESA, to review implementation monitoring results for each grazing season and weigh in on and influence modifications to grazing practices for the following season based on that review and also to help ensure that the actual effects of the grazing as it occurs remain within the scope of that authorized by the Forest Service and on which FWS premised its consultative analysis.  Thus, the Forest's regular use of EOY Reports to record results of implementation monitoring and the effects of the season for each allotment on which grazing occurred, provides one of the key systematic steps that the agency undertakes as it regularly considers what potential modifications or adjustments need to or should be made in the annual grazing strategy for the following year to avoid "carry-over effects" consistent with the direction in INFISH and the agency's interpretive guidance.  The Forest Service worked with its counterparts in FWS and other agencies to establish greater

consistency and efficiencies in the process of reporting in these EOY Reports required under the 2012-16 Bull Trout BiOp.  4SPAR 3102-10.

In addition to Implementation Monitoring and Effectiveness Monitoring, the Forest also prescribes the use of move trigger monitoring in its direction to permittees to help ensure that livestock are rotated from a particular unit within an allotment when forage utilization or vegetative impacts are approaching their authorized limits.  4SPAR 2966.  Another category of information on which the Forest Service relies is Stream Inventory Surveys, which generate comparable baseline information on conditions of fish-bearing streams that can be helpful in measuring changes in stream channel conditions over time.  4SPAR 2968.

Moreover, in 2009 the Forest developed and began utilizing as another administrative riparian habitat conservation tool in the identification of "Most Sensitive Riparian Areas" or "MSRAs."  4SPAR 2866.  The Forest employs MSRAs as a conservation management tool in connection with its efforts to protect Bull Trout consistent with its duties under INFISH and the ESA by identifying those stream reaches with valuable spawning habitat and high-potential fish production critical habitat that were also typically most accessible and sensitive to livestock use. 4SPAR 2963.  To identify such areas, the Forest uses stream channel gradient and valley width topographic features as well as the location of Oregon Department of Fish and Wildlife index spawning reaches.  *Id.*  There are three primary enhanced Bull Trout protective measures that the Forest applies in MSRAs, including the use of more stringent move triggers and endpoint indicators in recognition of the relatively greater sensitivity of such areas.  4SPAR 2964.

**B.    ESA Consultation on Authorized Livestock Grazing**

Within the temporal scope of Plaintiffs' claims, the Forest has engaged in the following consultation under the Endangered Species Act on its proposed livestock grazing authorizations

on the allotments at issue (i.e., beginning with such authorizations the Forest provided for grazing during the 2006-15 seasons). In that regard, on Oct. 14, 2005, FWS issued a letter concurring in the Forest's conclusion that the livestock grazing it proposed to authorize on all of the allotments at issue in Plaintiffs' claims except for the Central Malheur (which it did not address), may affect, but would not be likely to adversely affect Bull Trout or its designated critical habitat. SPAR 4280-4311. In analyzing the effects of the proposed grazing authorizations, FWS noted that "[i]t must be recognized that the degree of active involvement, effort and efficiency of management by the permittee will affect the distribution of livestock and use more than any other single factor." 4SPAR 4282. In setting forth the proposed actions and monitoring activities for each allotment for the 2006 grazing season, FWS further recognized that, "[i]n some cases, significant changes are proposed for 2006 to remedy past management problems and noncompliance issues." 4SPAR 4306-11 & Table 1.

Then, in 2007, FWS issued a follow-up Letter of Concurrence ("LOC") covering the Forest's authorized livestock grazing on all of the allotments at issue in Plaintiffs' claims (again, except for Central Malheur) for the five grazing seasons from 2007-11. PSPAR 5763-5824. Again, the LOC concurred in the Forest's finding that the authorized grazing during the covered seasons was not likely to adversely affect Bull Trout or its designated critical habitat. PSPAR 5767. More specifically, FWS set forth the grounds underlying their concurrence findings with respect to each allotment. PSPAR 5804-20. Most recently, FWS issued a combined LOC and Biological Opinion for the allotments at issue, including Central Malheur. 4SPAR 2944-3101. This time FWS concurred with the Forest's finding that the authorized livestock grazing proposed for all but two of the allotments at issue in Plaintiffs' claims was not likely to adversely affect Bull Trout or its designated critical habitat. 4SPAR 2949-50. Even in the two allotments

in which it concluded that adverse effects were likely to occur, it indicated in evaluating effects to each of the "Primary Constituent Elements" ("PCEs") of critical habitat that such effects would be "minimized," "localized and short-term," and the like, and thus, would not be likely to appreciably result in any lasting adverse effects to the quality or function of Bull Trout habitat. 4SPAR 3020-23.  Moreover, the Forest developed an Adaptive Management Strategy to be applied to the allotments that fell into this category to provide it with the ability to make management decisions more effectively based on new information and included a quantitative template for how it would deal with any exceedances that arose during the term of the consultation.  4SPAR 2736-38.  It developed this template in part based on a careful analysis of the best then-available data and research on the levels at which adverse effects to fish habitat are likely to carry over and persist to following seasons, as well as the acknowledgment that the monitoring system it uses to measure bank alteration, although state-of-the-art, nevertheless has an approximately six percent plus-or-minus margin of error associated with its results.  4SPAR 2728-31 & 2737-38.

**ARGUMENT**

    I.    MAGISTRATE JUDGE PAPAK CORRECTLY FOUND THAT THE FOREST SERVICE'S GRAZING AUTHORIZATIONS AT ISSUE ARE WHOLLY CONSISTENT WITH APPLICABLE MANAGEMENT DIRECTION.

Magistrate Judge Papak properly rejected Plaintiffs' claim that the Forest Service violated the GM-1 and LRMP Amendment 29 Standards and Guidelines in authorizing the livestock grazing on the allotments at issue based on his findings that:  (1) progress toward achievement of Riparian Management Objectives ("RMOs") can and should be evaluated at the watershed scale; (2) failure to have attained any particular RMO in a specific reach or stream does not give rise to a violation of INFISH; and (3) in light of the first two findings, Plaintiffs failed to carry their

burden to establish that the authorized livestock grazing they challenge is the cause of any

decline in Bull Trout populations or degradation of its habitat, or that the Forest Service had

otherwise acted arbitrarily and capriciously in authorizing the challenged grazing.  F&R at 18-

22.  On this basis, Magistrate Judge Papak rightly "conclude[d] that the Forest Service has not

acted arbitrarily and capriciously in authorizing grazing on the seven allotments in the Malheur

National Forest."  *Id.* at 22.

 Plaintiffs seek to attack Magistrate Judge Papak's conclusion on several grounds, which

suffer from three essential flaws that render their charges wholly ineffectual.  The first, and most

damaging, is the utterly misguided notion they continue to posit that the Forest Service has been

arbitrary and capricious in issuing each and every one of the grazing authorizations they

reference in the Complaint solely because it has not fulfilled the duty Plaintiffs allege it has to

make legal compliance findings for each and every LRMP standard that Plaintiffs could think of.

Second, Plaintiffs' NFMA claims fail because the <u>only</u> systematically gathered and scientifically

sound data and analysis in the record related to the trend of the riparian areas and fish habitat in

the affected subbasin –the PIBO Effectiveness Monitoring Program data and analysis -- actually

show that it is moving in a positive direction, and thus meeting the goals of INFISH and the

Malheur LRMP.  Third, identifying "hot spots" or pointing out instances of exceedances or

grazing beyond what the Forest Service has authorized at particular sites or in individual years

does not, contrary to Plaintiffs' assertions, establish that the agency is violating INFISH.

 A. Magistrate Judge Papak Correctly Found that the Appropriate Scale for Evaluating the Trend toward Attainment of RMOs is the Watershed Scale, and Plaintiffs' Attempts to Assail that Finding Have No Support in the Development of the Applicable Management Direction or the Case Law.

 Plaintiffs first seek to attack Magistrate Judge Papak's recommendation that the Forest

Service is entitled to prevail on their claims that the grazing authorizations at issue do not

comply with GM-1 or Amendment 29 on the basis of their contention that he erred in concluding

that the appropriate scale to determine such compliance is the watershed.  Pls.' Objs. at 12-19.

This contention is wholly off-base, however, as Magistrate Judge Papak's interpretation of the

Standards & Guidelines at issue faithfully tracks previous case law in this very Court and clear

direction of the Forest Service on the matter to which substantial deference is owed.  As

Magistrate Judge Papak found, "[t]his court has held that the Forest Service may assess

compliance with RMOs at the watershed level."  F&R at 18 (citing *Oregon Wild v. Forest Serv.,*

193 F. Supp. 3d 1156, 1171 (D. Or. 2016)(evaluation of RMOs "is to be assessed on a watershed

level")(emphasis supplied); *League of Wilderness Defenders/Blue Mtns. Biodiversity Proj. v.*

*Forest Serv.*, 883 F. Supp. 2d 979, 996-97 (D. Or. 2012)("holding that "it was not a clear error of

judgment for the Forest Service to evaluate PACFISH/INFISH standards primarily on a . . .

watershed scale"), *rev'd in part on other grds.,* 585 F. Ap'x 613 (9th Cir. 2014).  To these he

could well have added to the string cite to include *Oregon Wild v. Cummins*, 239 F. Supp. 3d

1247, 1277 (D. Or. 2017)("INFISH contemplates a flexible approach; RMO targets are not

intended to be met instantaneously, and RMO attainment is to be determined on a watershed

level, not on a stream-by-stream basis").  Moreover, in affirming this Court's opinion in

*Landwatch v. Connaughton*, No. 6:13-cv-2027-AA, 2014 WL 6893695 (D. Or. Dec. 5, 2014),

the Ninth Circuit indicated that the Forest Service's consideration of RMOs as benchmarks

against which to measure progress toward habitat goals over time is entitled to "substantial

deference" and referenced RMOs' "appropriate application to larger stream systems".  *Central*

*Oregon Landwatch v. Connaughton*, 2017 WL 3616386, at *7 (9th Cir. Aug. 23,

2017)(memorandum disposition).  Along these same lines, as a more general matter, this Court

has also previously pointed out in a similar context of a Plaintiffs' attempt to try to convince the

Court to tell the Forest Service the manner by which it evaluates compliance with its own management direction, "[i]t is not the proper role for federal courts 'to act as a panel of scientists' that instructs the Forest Service how to monitor progress toward its own Forest Plan objectives." *Hells Cyn. Pres. Council v. Connaughton,* 2013 WL 665134 (D. Or. Feb. 22, 2013)(quoting *Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir.2008)(*en banc*)).

Plaintiffs make the wholly implausible pitch that all of the foregoing precedent should be ignored here based on their contention that it is fundamentally inconsistent with the Ninth Circuit's opinion in *Pacific Coast Fed'n of Fishermens' Ass'ns v. NMFS*, 265 F.3d 1028 (9th Cir. 2001)("*PCFFA*"). But Plaintiffs fail to recognize two salient factors that wholly distinguish it from the situation the Court faces in this case. First, and most importantly, *PCFFA* involved a claim alleging that NMFS had violated its duties under the Endangered Species Act and was based on the clear language of a commitment that agency had imposed upon itself in a higher-scale Biological Opinion it had issued. *Id.* at 1035-36. Here, by contrast, this case involves an alleged NFMA violation and the agency's management direction clearly supports the opposite position from the one Plaintiffs are trying to foist upon it (as this Court has repeatedly found in the cases referenced above). Second, previous ill-fated efforts have been made to try to squeeze the square peg of the *PCFFA* ESA ruling into the round hole of NFMA compliance, and the Court has rejected it. In *LOWD*, this Court directly analyzed *PCFFA* and squarely concluded on that basis that neither the district court's nor the Ninth Circuit's opinion require the Forest Service to analyze PACFISH/INFISH compliance at each site-specific location at issue, as was urged by plaintiffs there and in this case as well. *LOWD*, 883 F. Supp. 2d at 998.

Finally, and in some ways of greatest importance given the imperative for the Court to accord substantial deference to the Forest Service's interpretation and implementation of its own

forest plan management direction, *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056

(th Cir. 2012), the Forest Service has made it clear that RMOs are to be evaluated at the

watershed scale since shortly after INFISH's adoption.  As noted above, in setting forth the

RMOs, the agencies expressly stated that "[a]ll of the described features may not occur in a

specific segment of stream within a watershed, but all generally should occur at the watershed

scale for stream systems of moderate to large size (3rd to 6th order streams)."  2SPAR 2472.

> B.  The F&R Did Not Err by Declining to Impose a Requirement on the Forest Service
> that Finds No Basis in Statute or Regulation to Convert the Annual Grazing
> Authorizations it provides to Permittees into Formalistic INFISH Compliance
> Documents, Especially Where, as Explained Above, Evaluation of Progress Toward
> Attainment of RMOs is to be Assessed at the Watershed Scale.

Plaintiffs also try to undermine Magistrate Judge Papak's recommended ruling in favor of

the Forest Service on their NFMA claims by continuing to contend that the Forest Service was

arbitrary and capricious in issuing the grazing authorizations referenced in their Complaint

because it did not analyze and make express findings that each and every such authorization is

consistent with all of the INFISH and Malheur LRMP standards cited in the Complaint, as well

as all of the multiple Riparian Management Objectives ("RMOs").  Pls.' Objs. at 12-16.

The problem for Plaintiffs is that no such duty exists, however.  At the outset, it should be

noted in this context that Plaintiffs had to reverse course and back off the primary argument on

which they originally relied to press this flawed argument in their summary judgment briefing

given their ultimate concession that the regulation they had contended was the main source of the

putative duty to make such findings actually does not apply to any of the grazing authorizations

referenced in their Complaint.  *Compare* Pls.' Op'g SJ Brf. at 31 (arguing that current version of

36 C.F.R. § 219.15(d) applies) *with* Pls.' SJ Reply at 23 (conceding that it does not apply).  That

is, Plaintiffs originally cited the current version of 36 C.F.R. Sec. 219.15(d) to support their

argument in this regard, which states that each "project or activity approval document must describe how the project or activity is consistent with applicable plan components"). Pls.' Op'g SJ Brf. at 31. In their opening brief, however, Federal Defendants explained that the regulation does not apply to any of the grazing authorizations referenced in Plaintiffs' Complaint, *see* Fed. Defs.' Op'g SJ Brf. at 7-8 & 62, and that the 1982 version of the NFMA regulations, which does not contain any such requirement, applies instead, a view to which Plaintiffs have now come around.[2] Pls.' SJ Reply at 23.

Notwithstanding this fundamental concession, Plaintiffs nevertheless refused to let go of the claim and, indeed, continue to press it in the current phase of briefing even after Magistrate Judge Papak properly declined to find merit in it based on the secondary arguments Plaintiffs present in an effort to salvage it. But the concession warrants noting upfront because, as the Supreme Court long ago counseled and the Ninth Circuit much more recently reinforced, in the absence of any clear mandatory procedural duty imposed by statute or regulation, an agency has essentially absolute discretion to select the procedures it employs in complying with its legal responsibilities. Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 543-44 (1978) (proclaiming that it is "absolutely clear" that, "[a]bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties")(internal quotation marks omitted); Lands Council v. McNair, 537 F.3d 981, 992 (9th Cir.)(*en banc*)(holding that the Forest Service has discretion

---

[2] This concession is entitled to even more importance given the fact that the later version of the regulation contains an explicit command for the Forest Service to engage in such an analysis, from which it can be rather readily implied, of course, that no such requirement exists under the 1982 version of the NFMA planning regulations that even Plaintiffs now concede applies to the grazing authorizations at issue in this case.

to determine how to meet the substantive standards and direction in its Forest Plans), *overruled in part on other grds. by* <u>Winter v. Natural Res. Def. Council</u>, 555 U.S. 7 (2008).  Moreover, the Ninth Circuit went on to explain that this discretion must be considered even broader in the context, as in the present scenario, of an agency's selection of processes and the framework by which it determines how to comply with management direction it itself has crafted and adopted. <u>Lands Council</u>, 537 F.3d at 992 ("Granting the Forest Service latitude to decide how best to demonstrate that its plans will provide for [a particular plan standard] comports with our reluctance to require an agency to show us, by any particular means, that it has met the requirements of the NFMA every time it proposes action").  What Plaintiffs are asking the Court to do would dishonor and run roughshod over that reluctance that the Ninth Circuit held is a binding characteristic a court must follow in reviewing an agency's compliance with management direction in one of its plans.

Here, Federal Defendants laid out that procedural framework for how the Forest implements and complies with INFISH and Amendment 29 to the Malheur LRMP in considerable detail in their opening summary judgment brief.  Fed. Defs.' Op'g SJ Brf. at 26-33.  One key element of this framework is to set utilization standards the permittee is to follow that can be monitored on an annual basis and then, on the basis of the results of this Implementation Monitoring, and in conjunction with permittees and conferment with the consulting agency (which, for Bull Trout, is FWS), and in light of variables such as precipitation levels as well as the Forest's depth of knowledge of on-the-ground conditions and any new or upgraded improvements, make whatever adjustments to grazing practices it deems may be necessary for the following season in order to avoid any adverse "carry-over effects."  The other key element is the use of PIBO Effectiveness Monitoring at the appropriate subbasin scale for the purpose of

evaluating whether the Forest Plan direction, as it is being implemented through utilization standards and other adjustments and measures the Forest is adopting, is allowing for improvements to riparian areas and fish habitat over time (i.e., is exhibiting a positive trend). The administrative records the Forest Service has lodged with the Court show that the agency has faithfully carried out both of these key elements and that the results are allowing for a positive trend in the subbasin within which the allotments at issue are situated such that it cannot be said that the Forest Service is either implementing or ensuring compliance with its INFISH or Malheur LRMP direction in a manner that is arbitrary and capricious.  As the Ninth Circuit made clear in Lands Council, that is all that is required.  Lands Council, 537 F.3d at 993 ("our proper rule is simply to ensure that the Forest Service made no 'clear error of judgment' that would render its action 'arbitrary and capricious'").

Second, the foregoing flaw leads to a second, cascading set of errors that wholly undermine Plaintiffs' ability to satisfy their burden on the merits of their NFMA claims.  These errors follow from the fact that Plaintiffs are trying to prevail on their claims "on the cheap," as it were, by not doing the hard work of actually establishing that the Forest Service was arbitrary and capricious in issuing any of the 100-plus grazing authorizations referenced in their Complaint on the basis of the applicable administrative record.  Instead, they are trying to employ a "broad-brush" argument that they contend applies to all of the authorizations when, as noted above, it clearly does not.  The Court has had previous experience with ONDA seeking to use a similar tack whereby it sought to have the Court simply sweep away all of the disparate agency actions subject to review with one fell swoop based on a generic argument, but the Court rightfully declined and instead put ONDA through its paces while doing the hard and sometimes tedious work of following well-established administrative law principles.  That case is ONDA v.

Cain, 17 F. Supp. 2d 1037 (D. Or. 2014) and, in that case, the Court declined to allow ONDA to

challenge even six Categorical Exclusions ("CXs") based on broad, sweeping arguments.  *Id.* at

1052-53 (rejecting ONDA's argument that the court must view all of the CXs together rather

than as individual actions).  The Court then went on and analyzed each CX on the basis of its

own distinct circumstances and administrative record.  *Id.* at 1054-58.

Further, allowing Plaintiffs to prevail on their claims on the basis of a single argument (or

simply extrapolating from certain more heavily grazed locations that Plaintiffs have selectively

identified, as Federal Defendants address in more detail below) would effectively serve to shift

the burden of proof away from Plaintiffs with respect to each individual agency action (and

perhaps that is part of the strategy behind it).  But two things must be remembered in this

context.  The first is that it was ONDA who litigated the issue of whether annual grazing

authorizations should be considered "final agency actions" subject to judicial review under the

APA all the way to the Ninth Circuit.  Two judges of this Court had found that they were not,

including in an earlier phase of this case.  Op. & Order (June 3, 2005)(Jones, J.)(Dkt. #228);

ONDA v. Forest Serv., 03-cv-381-HA, Op. & Order (June 20, 2005)(Haggerty, J.)(Dkt. # 195).

On an appeal taken by ONDA from the ruling in this case, however, two of the three judges on

the Ninth Circuit panel who heard the appeal disagreed and ruled that, over a vigorous dissent by

Circuit Judge Fernandez,[3] the Forest Service's annual grazing authorizations are "final agency

actions" subject to judicial review under the APA.  ONDA v. Forest Serv., 465 F.3d 977, 983-90

(9th Cir. 2006).  Second, ONDA made the decision following the remand to this Court from the

ruling of the Ninth Circuit and after many years during which the case was stayed to allow the

---

[3]  Consequently, it is worth observing that three of the five judges who have addressed this issue
ruled that annual grazing authorizations should <u>not</u> be considered "final agency actions."

parties to pursue settlement to hold on and seek to litigate a full decade's worth of grazing

authorizations within the scope of its Complaint.  The upshot is that ONDA has made its bed,

and now it must lie in it, which means that it does not get off the hook from having to comply

with the well-established jurisprudence that has applied to judicial review of separate and

discrete agency actions ever since adoption of the APA in 1946.  *See* 5 U.S.C. §§ 701-06.

       Third, the other major error inherent in the "nuclear option" approach Plaintiffs are

seeking to utilize in an attempt to knock out all of the authorizations based on a single argument

is that it also flies in the face of Supreme Court case law indicating that, even if the Court were

to determine that the Forest Service needs to address one or more particular compliance findings

for any or all of the authorizations within the scope of this case, the proper remedy is not to set

aside any such authorizations, but to remand them to the Forest Service to allow it make such

findings.  Florida Power & Light, 470 U.S. 729, 744 ("[I]f the reviewing court simply cannot

evaluate the challenged agency action on the basis of the record before it, the proper course,

except in rare circumstances, is to remand to the agency for additional investigation or

explanation"); *see also* INS v. Orlando Ventura, 537 U.S. 12, 16 (2002).  Indeed, this is precisely

what this Court recently did in another case in which ONDA was a plaintiff.  In ONDA v. BLM,

Case no. 08-cv-1271-KI (D. Or.), the Court remanded a legal issue to the Interior Board of Land

Appeals that it determined the Board had not resolved so that it would have the "benefit of its

interpretation."  ONDA v. BLM, Case no. 08-cv-1271-KI, Op. & Order at 53 (Dkt. #95)(D. Or.

Nov. 15, 2011).  If the same circumstances were to emerge here, the Court would need to follow

the same course instead of simply equating the Forest Service's lack of making a compliance

finding with its LRMP standards with an automatic, knee-jerk need to issue a judicial ruling of

non-compliance.  That linkage that Plaintiffs propose is a non-sequitur and fundamentally

inconsistent with Supreme Court case law.

II.     MAGISTRATE JUDGE PAPAK PROPERLY DETERMINED THE FOREST
        SERVICE CONSIDERED AMPLE & THE MOST RELEVANT DATA IN
        ISSUING THE GRAZING AUTHORIZATIONS & WAS THEREFORE ALSO
        CORRECT TO REJECT PLAINTIFFS' CLAIM THAT SUCH AUTHORIZATIONS
        WERE ARBITRARY & CAPRICIOUS BASED ON INADEQUATE DATA.

        Plaintiffs next challenge the F&R's finding that the Forest Service is entitled to summary

judgment on the merits of their NFMA claims based on Magistrate Judge Papak's determination

that the record is replete with data backing up the grazing authorizations at issue and showing

that they are allowing for a general upward trend in habitat conditions in the applicable

watershed.  Pls.' Objs. at 19-24.  The basis of Plaintiffs' challenge is that the Forest Service

allegedly failed to consider sufficient data.  *Id.* at 19.  But the record shows that this is simply not

the case; the agency just did not do so in the manner or to the magnitude that Plaintiffs would

have preferred.

        In this light, Magistrate Judge Papak correctly rebuffed Plaintiffs' claim that the Forest

violated INFISH by allegedly failing to collect and analyze sufficient data in issuing the

challenged grazing authorizations.  F&R at 22-27.  Instead, he found, relying heavily on PIBO

monitoring data and the declaration of the PIBO Team Leader Eric Archer providing technical

background information and explication concerning that program and the data collected under it,

Second Declaration of Eric K. Archer at (Apr. 17, 2017)(Dkt. #467), that the record amply shows

the Forest Service adequately monitored riparian conditions and analyzed the data it collected.

*Id.* at 22-24.  In so doing, Magistrate Judge Papak directly took stock of the criticisms Plaintiffs'

declarants leveled at the PIBO data set, including the sites at which it was collected.  *Id.* at 24-26.

Relying principally on points and observations calling into question the validity or thoroughness

of many of the assertions made by Plaintiffs' declarants in the Declaration of Dr. Tony Svejcar

(Dkt. #440), however, Magistrate Judge Papak correctly declined to find that those criticisms

served to undermine either the validity of the PIBO monitoring program or the general upward

trend in habitat conditions it shows is occurring within the relevant watershed, and also deferred

to the agency's decision to rely on stubble height, bank alteration, and woody browse as annual

implementation monitoring metrics. *Id.* at 24-27. The Magistrate Judge's reasoning is as

thorough as it is unassailable, as the record clearly shows.

       As an initial matter, the notion that the Forest Service has lacked adequate data in

reaching the challenged annual grazing authorizations to such an extent that it renders every

single one of the authorizations arbitrary and capricious, is devoid of merit from even a simple

glance at the reams of documentation in the administrative records that have been lodged in this

case. For example, the Forest has engaged in extensive implementation monitoring on each of

the allotments at issue, and has prepared End-of-Year ("EOY") Reports at the conclusion of

every one of these grazing seasons that sets forth the results of that season's implementation

monitoring. *See, e.g.,* 3SPAR 5064-5144 (2006 Rpt.); 3SPAR 5989-6032 (2007 Rpt.); 3SPAR

6306-44 (2008 Rpt.); 3SPAR 7100-34 (2009 Rpt.); 4SPAR 3450-3521 (final, revised 2011 Rpt.);

4SPAR 5900-6129 (2012 Rpt.); 4SPAR 7070-7309 (2013 Rpt.); 4SPAR 6577-6807 (2014 Rpt.);

4SPAR 11638-11872 (2015 Rpt.). Indeed, and of great irony, with the exception of several

expert declarations that Magistrate Judge Papak properly found were of limited utility or value,

F&R at 25-26, virtually all of the data on which Plaintiffs seek to premise their claims asserting

INFISH violations comes straight out of the Forest Service's records. Viewed in this light, it can

readily be seen that the true basis of Plaintiffs' claim in this regard is not a <u>lack</u> of data, but

rather a <u>disagreement</u> over how to interpret the data and their implications for how to manage the

grazing allotments at issue.  As the Court is well aware, in such scenarios, and as Magistrate

Judge Papak properly acknowledged, F&R at 26-27, "[w]hen specialists express conflicting

views, an agency must have discretion to rely on the reasonable opinions of its own qualified

experts even if, as an original matter, a court might find contrary views more persuasive." *Lands*

*Council v. McNair*, 537 F.3d 981, 1000 (9th Cir.)(en banc), *overruled in part on other grds. by*

*Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7 (2008).

       Of even greater salience in this context is the PIBO Effectiveness Monitoring data and

analysis, given that the Forest Service expressly developed the PIBO program in conjunction

with its sister agencies for the purpose of being able to evaluate trend at the appropriate scale for

assessing progress toward RMOs, the watershed, is showing generally an upward trend to a

degree and in a manner that is consistent with the goal of INFISH in the affected subbasin in

which the grazing allotments at issue are located.  *See* Table 2 at 4SPAR 11628 & 11615; 1st

Archer Declaration at ¶¶ 8, 13, & 14, & Att. A thereto.  Plaintiffs, apparently mindful of the

potency of these findings, seek to rely on the stones that one of their declarants casts at the PIBO

Effectiveness Monitoring program.  *See* Fourth Beschta Declaration at ¶ 17 (opining that PIBO

data has "little relevance" for the Malheur River or N. Fork of the Malheur because of the low

number of monitoring sites actually on such rivers and the fact that there is not a "Reference

site" within the Malheur National Forest).  Such stones fall well short of their mark, however, as

the PIBO Team Leader explains in a new, second declaration he has prepared to respond to and

counter some of the opinions proffered on the PIBO program reflected in the newest Beschta

Declaration.  In his Second Declaration, PIBO Team Leader Archer explains that there are no

"reference sites" on the Malheur NF because they lack any sub-watershed that meets the

necessary criteria and also that the program instead uses 250 reference sites that do satisfy those

criteria, which provide them with an ample sample size from which to be able to quantitatively

evaluate stream status, regardless of whether there is a local reference site nearby or not.  2nd

Archer Dec. at ¶ 8.  He further explains that, because of the scientifically rigorous rules that must

be followed in selecting sites at which to collect PIBO monitoring data, there is only one PIBO

Integrator site that occurs on the Malheur River or North Fork-Malheur River.  *Id.* at ¶ 4.

Because of the careful way in which such sites are selected, and to ensure that PIBO analysis can

satisfy the assumptions of parametric statistics, PIBO Team Leader Archer states his view that

"the fact that more PIBO sites are not on the Wild and Scenic River stream reaches at issue in

this case is of no relevance to undertaking an objective and systematic evaluation of the trend of

riparian conditions and fish habitat at the appropriate scale for such an assessment, the subbasin,

nor does it indicate that conclusions drawn from such an evaluation are not applicable to such

reaches just because they do not happen to contain a sampling site, again, largely due to

application of the selection criteria."  *Id.*  Moreover, because Dr. Beschta continues to submit

and seek to rely on photographs in an effort to support his opinions, PIBO Team Leader Archer

has compiled for submission to the Court a complete series of photos that the program takes as a

regular part of its effectiveness monitoring protocol.  *Id.* at ¶ 6 & Attachments I-XVII.  As

Archer explains, "the PIBO program also has numerous established photo points at which we

take repeated photos during our data-gathering efforts that also lend support to our conclusions

that fish habitat and riparian conditions have improved generally across the Upper Malheur River

subbasin, and further show that the positive trend holds at the majority of the stream sites where

the photos were taken."  *Id.*  Federal Defendants also submit additional declarations from Drs.

Brett Roper and Tony Svejcar to address and respond to the points that Dr. Beschta offered in

response to the original declarations they prepared that were filed in conjunction with Federal

Defendants' opening summary judgment papers.  In this context and after engaging in a careful and probing review of the relevant filings concerning this matter, Magistrate Judge Papak concluded as follows:  "I cannot find on this record that the Forest Service unreasonably relied on the PIBO monitoring data and analysis."  F&R at 26.

Plaintiffs also continue to fail to recognize that the Forest Service's livestock grazing program is constructed on a series of premises.  The first of these is that, because the RMOs against which progress is to be measured over time and at the scale of the applicable watershed, 2SPAR 2472-74, the agency has established annual "endpoint indicators" that are designed to ensure that the agency's grazing authorizations prescribing such metrics will allow for eventual achievement of the "desired future condition," in the words of the Malheur LRMP, or not prevent or retard attainment of RMOs, in the vernacular of INFISH.  SPAR 1 at IV-57; *see also* 4SPAR 3021 ("The assumption is that meeting these endpoint indicators would move key riparian and stream channel elements (bank stability, [width: depth] ratio, woody species regeneration) towards their Desired Conditions and meet Riparian Objectives").

In light of these premises, the Forest Service makes modifications as necessary from year-to-year in the course of administering the grazing permits on the allotments at issue in this case.  To demonstrate the way the agency has carried out its responsibilities in this context, Federal Defendants prepared a table summarizing the primary modifications, adjustments, and adaptive management revisions in which the Forest Service engaged in responding to instances in which implementation monitoring has indicated an exceedance occurred on an allotment, which is attached as Exh. C to their summary judgment reply brief.

Finally, it must be noted in this context that Plaintiffs' own data on which they would have this Court rely in an effort to meet their burden to show that the grazing authorizations they

challenge are somehow precluding or retarding attainment of RMOs as that term is used in GM-1 have nothing to do with trend, nor do they account for other past or present uses or ongoing effects from existing infrastructure or conditions. As such, they are wholly irrelevant to the determination of whether the watershed in question is moving toward the objectives the Forest Service has delineated in its management direction. In addition, from an analytical perspective, they can perhaps best be colloquially categorized as efforts to engage in "Graze Ipsa Loquitur," a variation of the tort causation principle by which a plaintiff simply points to a particular result or, here, on-the-ground condition, and makes the argument that, under the circumstances, it can necessarily be inferred that the conduct they challenge is the root cause of that result or condition. There is no precedent for borrowing such a principle in natural resources jurisprudence, however, and for good reason, especially with the deference owed to the expertise inhering within the federal agencies with which Congress has vested the responsibility to manage the resources at issue. This would also be particularly inappropriate with respect to Plaintiffs' current claims given that the record is clear that there are many causative factors that are responsible for the conditions about which Plaintiffs have expressed concern. *See* F&R at 21 ("As Defendants note, many factors have contributed to that decline," and citing FWS's 2012 BiOp in support of this conclusion). Thus, Magistrate Judge Papak was correct to decline to allow Plaintiffs to seek to engage in an end run around meeting their burden of proof under the APA in regard to their NFMA claims.

In sum, then, the record is quite veritably bulging at the seams with relevant and appropriately gathered data from a variety of sources that properly led Magistrate Judge Papak to "conclude that the Forest Service acted reasonably in the collection and analysis of data on riparian habitat conditions." F&R at 26. The Court should not disturb this sound conclusion.

**Page 29 -** FED. DEFS.' RESP. TO PLS.' OBJS. TO FINDINGS & RECOMMENDATION
*ONDA v. Forest Serv.,* Case no. 03-cv-213-PK

III.    MAGISTRATE JUDGE PAPAK PROPERLY FOLLOWED THE PRECEDENT OF
        THIS COURT IN DETERMINING THAT THE NARRATIVE FOREST PLAN
        STANDARDS ARE NOT JUDICIALLY ENFORCEABLE AGAINST SITE-
        SPECIFIC ACTIONS LIKE THE GRAZING AUTHORIZATIONS AT ISSUE.

In regard to Plaintiffs' NFMA claim that the Forest violated a series of Forest Plan narrative

standards in authorizing the livestock grazing on the allotments at issue, Magistrate Judge Papak

correctly determined that such standards are not judicially reviewable or enforceable in the

context of individual Forest Service actions such as decisions to authorize grazing or specify a

particular annual grazing strategy.  F&R at 16-17.  In so doing, he followed and carefully tracked

the analysis and conclusions in a recent case of the Court in rebuffing similar efforts to

selectively pull various and sundry planning provisions out of the literally hundreds that exist in

a Land and Resource Management Plan for a National Forest prepared pursuant to NFMA and

seek to judicially enforce them to site-specific actions to which they have no applicability.

*Landwatch,* 2014 WL 6893695, at *7.  This approach is also consistent with the direction the

Supreme Court has provided on the way in which courts are to address agencies' planning

documents, to be duly careful of not taking any particular snippet of text out of context and with

full recognition of the fact that many of the provisions are aspirational or inherently long-term in

nature.  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004).

IV.    MAGISTRATE JUDGE PAPAK PROPERLY REJECTED PLAINTIFFS' FLPMA
       CLAIM GIVEN HIS THOROUGHLY SOUND CONCLUSION THAT THE
       STATUTE PROVIDES THE FOREST SERVICE WITH ESSENTIALLY
       UNFETTERED DISCRETION TO DETERMINE WHETHER & WHEN TO
       PREPARE OR UPDATE ALLOTMENT MANAGEMENT PLANS.

Plaintiffs also object to Magistrate Judge Papak's straightforward and unquestionably sound

conclusion that the Forest Service is not legally required by statute or rule to issue or update

under any particular timetable of Plaintiffs' preference Allotment Management Plans for the

grazing allotments at issue in Plaintiffs' claims.  Pls.' Objs. at 29-31.  The only real argument

**Page 30 -** FED. DEFS.' RESP. TO PLS.' OBJS. TO FINDINGS & RECOMMENDATION
        *ONDA v. Forest Serv.,* Case no. 03-cv-213-PK

that Plaintiffs offer in their objections to counter the sound reasoning and analysis of Magistrate

Judge Papak is the novel argument that the law of the case somehow already ruled to the

contrary on this issue. *Id.* at 29-30 (*citing Oregon Natural Desert Ass'n v. Forest Serv.,* 465 F.3d

977, 980 (9th Cir. 2006). This argument cannot withstand scrutiny, however, for two reasons.

First, and most important, the language that Plaintiffs cite cannot under any reasonable

interpretation be considered to be a part of the holding of the case. As the court itself noted in

the opening statement of the opinion, "[t]his appeal presents the narrow question whether the

United States Forest Service's issuance of annual operating instructions ("AOIs") to permittees

who graze livestock on national forest land constitutes final agency action for purposes of

judicial review under the [APA], 5 U.S.C. §§ 702-706." *Id.* at 977. Thus, it had nothing to do

with the legal nature of an AMP, or the circumstances under which such plans may be required

to be prepared. Second, notwithstanding their criticism that Magistrate Judge Papak is ignoring

language set forth in passing from the Ninth Circuit's opinion in *ONDA*, it is actually Plaintiffs

who blithely ignore the truly salient language in the statute itself, which, as the judge found,

expressly gives the Forest Service discretion in deciding whether to prepare or update AMPs.

F&R at 14-15 (citing 43 U.S.C. § 1752(d)). Magistrate Judge Papak's reading of the statute is

sound, and Plaintiffs' objections do nothing to undermine that interpretation.

V.      MAGISTRATE JUDGE PAPAK PROPERLY DETERMINED THE FOREST
        SERVICE CONSIDERED AMPLE & THE MOST RELEVANT DATA IN
        ISSUING THE GRAZING AUTHORIZATIONS & WAS THEREFORE ALSO
        CORRECT TO REJECT PLAINTIFFS' CLAIM THAT SUCH AUTHORIZATIONS
        WERE ARBITRARY & CAPRICIOUS BASED ON INADEQUATE DATA.

Plaintiffs finally and rather half-heartedly devote the last page and a half of their objections

to objecting to Magistrate Judge Papak's recommendation that the Court rule in favor of the

Forest Service on their W&SRA claim as well. Pls.' Objs. at 31-32. With regard to this claim,

Magistrate Judge Papak rejected Plaintiffs' argument that the Forest Service had violated its duty to protect and enhance the Outstandingly Remarkable Values for which the Wild and Scenic River corridors were designated in issuing the challenged grazing authorizations based on his finding that the W&SRA expressly contemplates the continuation of uses that interfere with ORVs and that the Forest reasonably determined that the challenged grazing is not substantially interfering with those values. F&R at 27-28. In so doing, he followed this Court's interpretation and application of the W&SRA to individual grazing authorizations in *Oregon Wild*, 193 F. Supp. 3d at 1172. He also deferred to what he found to be the agency's reasonable determination in the W&SR Report the Forest prepared in 2013 that livestock grazing on the allotments at issue during the relevant time period did not, in the words of the statute, substantially interfere with the public's use and enjoyment of aesthetic, scenic, historic, or scientific values for which the W&SR corridors at issue in this case were designated. F&R at 28. He further determined that Plaintiffs had done nothing to show any violation of this statutory standard. *Id.*

The only real arguments that Plaintiffs trot out in support of their objection in this regard are their own essentially contrary construction of the statutory language at issue and the assertion that the Court should not have deferred to the agency's construction because it allegedly was a post-hoc rationalization by litigation counsel. Pls.' Objs. at 31. This ignores the fact that this Court already accepted virtually the same interpretation by the agency in the *Oregon Wild* case just last year. *Oregon Wild*, 193 F. Supp. 3d at 1172. Thus, contrary to Plaintiffs' contention, it obviously cannot be the case that the interpretation arose for the first time during briefing in this litigation. In addition, more than 35 years ago the Forest Service partnered with the National Park Service to offer guidance on how to construe and apply the relevant standard that is wholly consistent with the way the Court interpreted it here. *See* 47 Fed. Reg. 39,454 (Sept. 7,

1982)("W&SRA Guidelines").  In those W&SRA Guidelines, there are two points that bear emphasis in the context of the current litigation.  Initially, with general respect to federal agencies' management of Wild and Scenic River segments designated pursuant to the W&SRA, the Guidelines state that such river segments "shall be managed with plans prepared in accordance with the requirements of the [W&SRA], other applicable laws, and [certain] general management principles laid out in the Guidelines."  47 Fed. Reg. at 39,458.  Before setting forth a series of such general management principles, the Guidelines provide that managing agencies are to implement them "to the fullest extent possible under their general statutory authorities and existing Federal, State, and local laws," 47 Fed. Reg. at 39,459, thereby indicating that Section 10(a) of the Act does not confer any supplemental management authority on the agencies beyond that which they already possess in terms of their management of Wild and Scenic Rivers.

Next, one of the Guidelines, related to Agricultural and Forestry Practices, is of particular relevance to the case at hand.  More specifically, it states as follows:  "Agricultural and forestry practices should be similar in nature and intensity to those present at the time of designation. Generally, uses more intensive than grazing and hay production are incompatible with wild river classification."  This principle gives rise to two logical inferences.  The first is that livestock grazing is generally compatible with a river's designation as a Wild or Scenic River under the W&SRA.  And the second is that management of livestock grazing at a similar nature and intensity has generally been seen as compatible with the management requirements of the W&SRA since shortly after its enactment.  Finally, the Ninth Circuit has also previously discussed and applied the "protect and enhance" language in the WSRA as follows:

> Lacking a statutory definition of "protect" or "enhance," we give these terms their common meaning. The mandate to "protect and enhance" does not, however, lead inexorably to the conclusion that permitting motorized use on both the wild and scenic portions of the river violates the statute.

**Page 33 -** FED. DEFS.' RESP. TO PLS.' OBJS. TO FINDINGS & RECOMMENDATION
*ONDA v. Forest Serv.,* Case no. 03-cv-213-PK

Significantly, the WSRA's "protect and enhance" language does not stand alone.  Congress instructed that designated rivers be managed "without, insofar as is consistent [with the values motivating designation of the river], limiting other uses that do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. § 1281(a). Congress thus recognized that other uses could "interfere with public use and enjoyment" but that not all such uses were to be prohibited. Only those uses that, consistent with the protection and enhancement of values "substantially interfere" with enjoyment and use of the values at issue are to be limited.

The Forest Service's decisions with respect to what uses are inconsistent with protection and enhancement and "substantially interfere" with the river corridor's values must be accorded substantial deference given the standard of review.

Hells Canyon Alliance v. Forest Serv., 227 F.3d 1170, 1177-78 (9th Cir. 2000).

**CONCLUSION**

For the foregoing reasons, as well as those set forth in its briefing and oral argument on the parties' cross-motions for summary judgment, as supported by the Forest Service's administrative records that have been filed with the Court, as appropriately supplemented by Federal Defendants' declarations per Magistrate Judge Papak's finding to that effect, the Court should reject Plaintiffs' Objections to the F&R and instead adopt the F&R in its entirety insofar as it finds and recommends ruling in favor of Federal Defendants on the merits of each of Plaintiffs' claims in this action.

Respectfully submitted this 19th day of January 2018.

s/ Stephen J. Odell
STEPHEN J. ODELL
Assistant U.S. Attorney
 Of Attorneys for Federal Defendants